## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| VANDA PHARMACEUTICALS INC. and AVENTISUB LLC, | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) )   C.A. No. 13-1973 (GMS) )   CONSOLIDATED ) |
| ROXANE LABORATORIES, INC., | ) ) |
| Defendant. | ) |

## VANDA'S PROPOSED POST-TRIAL
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Karen Jacobs (#2881)
Ethan H. Townsend (#5813)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
kjacobs@mnat.com
etownsend@mnat.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Nicholas Groombridge
Eric Alan Stone
Kira A. Davis
Josephine Young
Daniel J. Klein
PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 373-3000

April 18, 2016

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................................ iv

I.    Plaintiffs' Proposed Findings of Fact ...................................................................................1

  A.    Background ...................................................................................................................1

     1.    Schizophrenia and Its Treatments .......................................................................2

     2.    Development of the '198 Patent ...........................................................................3

     3.    Development of the '610 Patent ...........................................................................5

  B.    Infringement .................................................................................................................9

     1.    The '198 Patent .....................................................................................................9

     2.    The '610 Patent ...................................................................................................10

  C.    Validity .......................................................................................................................13

     1.    Nonobviousness of the '198 Patent ...................................................................13

     2.    Nonobviousness of the '610 Patent ...................................................................17

     3.    Subject Matter Eligibility of the '610 Patent ....................................................23

     4.    Written Description of the '610 Patent ..............................................................25

  D.    Relief ..........................................................................................................................26

     1.    Effective Date of Approval: § 271(e)(4)(A) ......................................................26

     2.    Injunction: §§ 271(e)(4)(B) and 283 .................................................................26

II.   Proposed Conclusions of Law ..............................................................................................27

  A.    Jurisdiction and Venue ...............................................................................................27

  B.    Infringement ...............................................................................................................27

  C.    Validity .......................................................................................................................28

     1.    Presumption of Validity; Burden to Prove Clear and Convincing Evidence ............28

     2.    Nonobviousness ..................................................................................................28

     3.    Subject-Matter Eligibility ..................................................................................36

     4.    Written Description .............................................................................................38

  D.    Relief ..........................................................................................................................39

III.  Conclusion ............................................................................................................................40

## TABLE OF CONTENTS (CONTINUED)

Page

Appendix A - Vanda's Witnesses ......................................................... A-1

    Dr. Mihael Polymeropoulos ........................................................ A-1

    Dr. Larry J. Kricka ................................................................. A-1

    Dr. Sheldon H. Preskorn ........................................................... A-1

    Dr. Gustavo Alva .................................................................. A-2

    Ms. Julie Economou ............................................................... A-2

    Ms. Sarah Smith .................................................................. A-2

    Dr. Curt Wolfgang ................................................................ A-3

    Mr. Joseph Strupczewski ........................................................... A-3

    Dr. Paul Allan Bartlett ............................................................. A-3

    Dr. Bryan Roth .................................................................... A-4

    Dr. Frederick Peter Guengerich .................................................... A-5

Appendix B - Asserted Claims and the Court's Claim Construction ...................... B-1

    A.    Asserted Claims of the '198 Patent .......................................... B-1

    B.    Asserted Claims of the '610 Patent .......................................... B-1

    C.    The Court's Construction of the Claim Terms of the '610 Patent ............... B-3

TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abbott Labs.* v. *Sandoz, Inc.*,
544 F.3d 1341 (Fed. Cir. 2008) ...................................................................................35

*Alcon Research Ltd.* v. *Barr Labs., Inc.*,
745 F.3d 1180 (Fed. Cir. 2014) ...................................................................................39

*Alice Corp.* v. *CLS Bank Int'l*,
134 S. Ct. 2347 (2014) ............................................................................................37, 38

*Allergan, Inc.* v. *Alcon Labs., Inc.*,
324 F.3d 1322 (Fed. Cir. 2003) ...................................................................................27

*Ariad Pharm. Inc.* v. *Eli Lilly & Co.*,
598 F.3d 1336 (Fed. Cir. 2010) ..............................................................................38, 39

*AstraZeneca LP* v. *Apotex, Inc.*,
633 F.3d 1042 (Fed. Cir. 2011) ...................................................................................28

*Bayer Schering Pharma AG* v. *Barr Labs., Inc.*,
575 F.3d 1341 (Fed. Cir. 2009) .......................................................................30, 31, 33

*Bristol-Meyers Squibb Co.* v. *Merck & Co.*,
No. 15-560 (GMS), 2016 WL 1072841 (D. Del. Mar. 17, 2016)..........................37

*Bristol-Myers Squibb Co.* v. *Royce Labs.*,
69 F.3d 1130 (Fed. Cir. 1995) .....................................................................................27

*Broadcom Corp.* v. *Emulex Corp.*,
732 F.3d 1325 (Fed. Cir. 2013) ...................................................................................34

*Celsis In Vitro, Inc.* v. *CellzDirect, Inc.*,
664 F.3d 922 (Fed. Cir. 2012) .....................................................................................39

*Commil USA, LLC* v. *Cisco Systems, Inc.*,
135 S. Ct. 1920 (2015) .................................................................................................27

*Daiichi Sankyo Co.* v. *Matrix Labs., Ltd.*,
619 F.3d 1346 (Fed. Cir. 2010) ..............................................................................30, 31

*DDR Holdings, LLC* v. *Hotels.com. L.P.*,
773 F.3d 1245 (Fed. Cir. 2014) ...................................................................................37

*Ecolochem, Inc.* v. *S. Cal. Edison Co.*,
227 F.3d 1361 (Fed. Cir. 2000) ...................................................................................36

*Eisai Co.* v. *Dr. Reddy's Labs., Ltd.*,
533 F.3d 1353 (Fed. Cir. 2008) ...................................................................................31

*Eli Lilly & Co. v. Zenith Goldline Pharm., Inc.*,
471 F.3d 1369 (Fed. Cir. 2006) ...................................................................................29

**TABLE OF AUTHORITIES (CONTINUED)**

Page(s)

**Cases (continued)**

*Geo. M. Martin Co.* v. *Alliance Mach. Sys. Int'l LLC,*
  618 F.3d 1294 (Fed. Cir. 2010) ............................................................36

*Graham* v. *John Deere Co.,*
  383 U.S. 1 (1966)...................................................................................28, 36

*In re '318 Patent Infringement Litig.,*
  578 F. Supp. 2d 711 (D. Del. 2008)......................................................33

*In re Armodafinil Patent Litig. Inc. ('722 Patent Litig.),*
  939 F. Supp. 2d 456 (D. Del. 2013)......................................................32

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.,*
  676 F.3d 1063 (Fed. Cir. 2012) ......................................................32, 33, 36

*In re Dow Chem. Co.,*
  837 F.2d 469 (Fed. Cir. 1988) ..............................................................35

*In re Gurley,*
  27 F.3d 551 (Fed. Cir. 1994) ................................................................34

*In re Kubin,*
  561 F.3d 1351 (Fed. Cir. 2009) ......................................................32, 33

*In re Omeprazole Patent Litig.,*
  536 F.3d 1361 (Fed. Cir. 2008) ............................................................39

*In re Tomlinson,*
  363 F.2d 928 (C.C.P.A. 1966) ..............................................................35

*Institut Pasteur* v. *Focarino,*
  738 F.3d 1337 (Fed. Cir. 2013) ............................................................36

*InTouch Techs., Inc.* v. *VGo Commc'ns, Inc.,*
  751 F.3d 1327 (Fed. Cir. 2014) ......................................................28, 36

*Janssen Prods., L.P.* v. *Lupin Ltd.,*
  109 F. Supp. 3d 650 (D.N.J. 2014) .......................................................39

*K/S Himpp* v. *Hear-Wear Techs. LLC,*
  751 F.3d 1362 (Fed. Cir. 2014) ............................................................34

*Kaavo Inc.* v. *Cognizant Tech. Sols. Corp.,*
  No. CV 14-1192 (LPS) (CJB), 2016 WL 476730 (D. Del. Feb. 5, 2016)..............37

*Leo Pharm. Prods., Ltd.* v. *Rea,*
  726 F.3d 1346 (Fed. Cir. 2013) ......................................................33, 34

*Mayo Collaborative Servs.* v. *Prometheus Labs., Inc.,*
  132 S. Ct. 1289 (2012) ....................................................................24, 38

TABLE OF AUTHORITIES (CONTINUED)

Page(s)

**Cases (continued)**

*Merck Sharp & Dohme Corp.* v. *Sandoz, Inc.*,
    No. 12-3289 (PGS), 2013 WL 591976 (D.N.J. Feb. 14, 2013)................................................27

*Microsoft Corp.* v. *i4i Ltd. P'ship*,
    131 S. Ct. 2238 (2011) ...........................................................................................28, 36

*Minn. Mining & Mfg. Co.* v. *Johnson & Johnson Orthopaedics, Inc.*,
    976 F.2d 1559 (Fed. Cir. 1992) ......................................................................................36

*Novartis Consumer Health, Inc.* v. *Johnson & Johnson—Merck Consumer Pharm. Co.*,
    290 F.3d 578 (3d Cir.2002) ...........................................................................................39

*Novartis Pharm. Corp.* v. *Par Pharm., Inc.*,
    48 F. Supp. 3d 733 (D. Del. 2014).................................................................................34

*Ortho-McNeil Pharm., Inc.* v. *Mylan Pharm., Inc.*,
    520 F.3d 1358 (Fed. Cir. 2008) ......................................................................................33

*Otsuka Pharm. Co.* v. *Sandoz, Inc.*,
    678 F.3d 1280 (Fed. Cir. 2012) ................................................................................29, 30

*Procter & Gamble Co.* v. *Teva Pharm. USA, Inc.*,
    566 F.3d 989 (Fed. Cir. 2009) .................................................................................32, 36

*Purdue Pharma L.P.* v. *Boehringer Ingelheim GmbH*,
    237 F.3d 1359 (Fed.Cir.2001) .......................................................................................39

*Research Found. of State Univ. of N.Y.* v. *Mylan Pharm. Inc.*,
    C.A. No. 09-184 (LPS), 2012 WL 1901267 (D. Del. May 25, 2012) ...................................40

*Robert Bosch LLC* v. *Pylon Mfg. Corp.*,
    659 F.3d 1142 (Fed. Cir. 2011) ................................................................................39, 40

*Sanofi-Synthelabo* v. *Apotex, Inc.*,
    470 F.3d 1368 (Fed. Cir. 2006) ......................................................................................40

*Sanofi-Synthelabo* v. *Apotex, Inc.*,
    550 F.3d 1075 (Fed. Cir. 2008) ......................................................................................31

*Shire LLC* v. *Amneal Pharm., LLC*,
    802 F.3d 1301 (Fed. Cir. 2015) ......................................................................................34

*Syntex (U.S.A.) LLC* v. *Apotex, Inc.*,
    407 F.3d 1371 (Fed. Cir. 2005) ......................................................................................34

*Takeda Chem. Indus., Ltd.* v. *Alphapharm Pty., Ltd.*,
    492 F.3d 1350 (Fed. Cir. 2007) ................................................................................31, 32

*Takeda Pharm. U.S.A., Inc.* v. *West-Ward Pharm. Corp.*,
    785 F.3d 625 (Fed. Cir. 2015) .......................................................................................28

TABLE OF AUTHORITIES (CONTINUED)

Page(s)

**Cases (continued)**

*Warner-Lambert Co.* v. *Apotex Corp.*,
   316 F.3d 1348 (Fed. Cir. 2003) ..............................................................................27


**Statutes**

21 U.S.C. § 355(j)(2)(A)(vii)(IV) ..............................................................................1

28 U.S.C. § 1331..........................................................................................................27

28 U.S.C. § 1338(a) ....................................................................................................27

28 U.S.C. § 1391..........................................................................................................27

28 U.S.C. § 1400(b) ....................................................................................................27

35 U.S.C. § 271(e)(2)..............................................................................................27, 39

35 U.S.C. § 271(e)(4)..............................................................................................39, 40

35 U.S.C. § 282............................................................................................................28

35 U.S.C. § 283......................................................................................................39, 40

I.     **Plaintiffs' Proposed Findings of Fact**

A.     **Background**

1.     Two patents are at issue in this case: U.S. Reissue Patent No. 39,198 ("the '198 patent") and U.S. Patent No. 8,586,610 ("the '610 patent").  Asserted claim 3 of the '198 patent claims the compound known as iloperidone.  Asserted claims 1–9, 11–13, and 16 of the '610 patent claim methods of treating patients suffering from schizophrenia using iloperidone. Appendix B.

2.     Plaintiff Aventisub LLC ("Aventisub") is the assignee of the '198 patent, which is exclusively licensed to Plaintiff Vanda Pharmaceuticals, Inc. ("Vanda").  Vanda is the assignee of the '610 patent.  *See* Joint Pretrial Order [D.I. 154], Ex. 1 (Joint Statement of Uncontested Facts) ¶¶ 1, 9, 13.  Vanda markets iloperidone in the United States as FANAPT®, FDA-approved for the treatment of schizophrenia.  Both patents are listed in the "Orange Book," *Approved Drug Products with Therapeutic Equivalence Evaluations*.  *See id.* ¶ 28.

3.     Defendant Roxane Laboratories, Inc. ("Roxane") filed Abbreviated New Drug Application No. 20-5480 ("Roxane's ANDA") with FDA seeking approval for the commercial manufacture, use, and sale of iloperidone prior to the expiration of the '198 and '610 patents, and delivered notice letters ("Roxane's Notice Letters") regarding Roxane's "Paragraph IV" certifications (*see* 21 U.S.C. § 355(j)(2)(A)(vii)(IV)) asserting that the '198 and '610 patents are invalid and not infringed.  *See id.* ¶¶ 30–31.

4.     Aventisub's and Vanda's predecessors-in-interest filed Civil Action No. 13-1973-GMS, alleging infringement of the '198 patent, against Roxane on November 25, 2013, within forty-five days of receipt of Roxane's Notice Letter.  The resulting 30-month stay expires November 9, 2016.  Vanda filed Civil Action No. 14-757-GMS, alleging infringement of the '610 patent, on June 16, 2014.  There is no 30-month stay regarding the '610 patent.

### 1.     Schizophrenia and Its Treatments

5.     Schizophrenia is an incurable, devastating psychiatric disorder that affects about 1% of the population.  Its symptoms can overtake the lives of its victims, preventing employment and even socialization.  *See id.* ¶ 19; Tr. at 78:18–25, 79:1–9 (Polymeropoulos).

6.     Schizophrenia had essentially no effective treatment until the late 1940s and early 1950s, when chlorpromazine was discovered to have antipsychotic properties.  Tr. at 715:3–13 (Sargent); 888:11–889:19 (Roth).  Thereafter, pharmaceutical companies searched for similar drugs that could also be antipsychotics.  Tr. at 888:11–889:19 (Roth).  The early antipsychotics, including chlorpromazine and haloperidol, were effective at treating schizophrenia but had terrible side effects, ranging from sedation to the "extrapyramidal symptoms" (EPS) of rigidity, Parkinson's-like tremors, and akathisia, a pervasive sense of inner restlessness.  Tr. at 715:3–716:15 (Sargent); 888:11–890:12, 906:20–907:1 (Roth).  The side effects were so severe that they led often to patients discontinuing their medication (with some side effects persisting thereafter), and sometimes to suicide or suicidal ideation.  Tr. at 80:1–82:11, 112:9–11 (Polymeropoulos); PX-192 (CATIE Study).

7.     The search for better antipsychotics led to the discovery, in the 1960s, of clozapine, which matched its predecessors in efficacy but caused much lower EPS.  Clozapine was dubbed an "atypical" antipsychotic, retroactively branding its predecessors as "typical."  Tr. at 716:16–717:9 (Sargent); 891:10–893:12 (Roth).  But soon after clozapine was introduced in Europe, it was found to cause a potentially fatal side effect: agranulocytosis, which results in lowered white blood cell count.  *Id.*  FDA did not approve clozapine until 1990, and then only for treatment-resistant patients and only when accompanied by extensive blood monitoring.  *Id.*

8.     Despite its side effects, clozapine demonstrated that schizophrenia could be treated without EPS.  *Id.*  Beginning in the mid-1970s, medicinal chemists at major

pharmaceutical companies around the world tried to find an atypical antipsychotic with clozapine's efficacy but without its toxicity.  *Id.*; *see also* Tr. at 719:22–721:9, 725:9–11 (Sargent).  Despite more than a decade of work by hundreds of scientists, no other atypical antipsychotic was FDA approved until Janssen Pharmaceuticals' risperidone in 1993.  The work continues even today, unfortunately without much success.  Tr. at 719:11–22 (Sargent); 894:4–6, 897:17–23 (Roth).

9.      As of 1989—the date of invention of iloperidone—it was unknown what chemical features caused atypicality, and thus it was completely unpredictable whether a given compound would have atypical properties.  Tr. at 729:10–16, 732:25–733:4 (Sargent).  Clozapine, then the sole atypical antipsychotic, was known to interact with dozens of different receptor types in the brain, all of which were areas of further research.  Tr. at 895:16–196:4 (Roth); 723:7–18 (Sargent).  Scientists investigated involvement of the dopamine ($D_2$) receptors, the sigma ($\sigma$) receptor, and the ratio of the $D_2$ receptor activity to that of the serotonin (5-$HT_2$) receptor, as only some examples.  Tr. at 798:11–24, 804:6–16 (Strupczewski); 670:5–7 (Sargent); 886:15–24, 887:16–20, 896:12–897:5 (Roth) (citing PX-127 (Weber, PNAS (1986))).

10.     Even after risperidone came to market, there was a need for atypical antipsychotics with fewer side effects.  For example, many atypical antipsychotics cause akathisia, which leads to poor patient compliance and, in some case, to suicide or suicidal ideation.  Tr. at 80:1–10, 81:1–82:11, 112:9–11 (Polymeropoulos); PX-192 (CATIE Study).

**2.      Development of the '198 Patent**

11.     Iloperidone was invented by medicinal chemists at Hoechst-Roussel, a predecessor to Aventisub.  Its inventors, named on the '198 patent, were Joseph Strupczewski and his then-supervisor Dr. Grover Helsley (now deceased).  Tr. at 767:22–768:2 (Strupczewski).  Hoechst's efforts to invent an atypical antipsychotic reflected the efforts of the industry as a

3

whole after the discovery of clozapine: Hoechst scientists, including Strupczewski and Helsley, worked for over a decade, pursuing avenue after avenue and compound after compound—without success. Among the classes of compounds they investigated were butyrophenone analogs, including benzoyl piperidines, benzisoxazole piperidines, benzisothiazole piperidines, and indazole piperidines and piperazines. Tr. at 768:6–12, 768:22–769:2, 771:254, 780:23–781:17, 786:22–787:3, 788:15–20 (Strupczewski). This work was inventive enough to result in several patents and multiple publications in prestigious journals. *See* DTX-278 (U.S. Patent No. 4,327,103); DTX-148 (U.S. Patent No. 4,352,811); DTX-281 (U.S. Patent No. 4,355,037); DTX-282 (U.S. Patent No. 4,458,076); JX-25 (ACS Abstract (1982)); JX-26 (J. Med. Chem. (1985)). But of the hundreds of compounds that they investigated, none turned out to have atypical antipsychotic activity. *See* Tr. at 776:10–12, 779:1–6 (Strupczewski).

12.     In 1988, while Strupczewski was investigating a series of indazole piperidines and piperazines, Helsley drew a chemical structure on a piece of paper and told Strupczewski to synthesize it. Not expecting the structure to be significant, and occupied with other tasks, Strupczewski put the paper in his desk drawer, turning to it only later after some prodding. Tr. at 791:11–792:11 (Strupczewski). Even then, Strupczewski synthesized a compound other than the one Helsley requested; Helsley's drawing called for a compound with a benzisoxazole component, but Strupczewski did not have any benzisoxazoles on hand. He therefore synthesized an indazole piperazine analog instead, and submitted it for biological testing as a potential antipsychotic and analgesic. Tr. at 793:6–23 (Strupczewski); JX-24 (Compound Data Sheets) at 264. Thereafter, Strupczewski synthesized the precise compound Helsley had drawn, submitting it, too, for biological testing as a potential antipsychotic and analgesic. Tr. at 796:17–21 (Strupczewski); JX-24 (Compound Data Sheets) at 311.

13.     The compound Helsley drew is now known as iloperidone.  Upon testing, it showed promise as a potential atypical antipsychotic agent.  Strupczewski and his colleagues (and co-inventors) then used iloperidone as a lead compound and made numerous modifications to it, seeking to improve its performance.  Tr. at 765:13–21, 799:17–800:14 (Strupczewski), JX-2 ('198 patent).  As it turned out, against expectations, none of the modifications were improvements; iloperidone emerged as the best compound.  Tr. at 800:15–23 (Strupczewski).

14.     The invention of iloperidone and related compounds led to the '198 patent (JX-2), "Heteroarylpiperidines, Pyrrolidines and Piperazines and Their Use as Antipsychotics and Analgesics," which issued on July 18, 2006 and claims priority to U.S. Patent Application No. 07/354,411, filed on May 19, 1989.  It states that the then-known antipsychotics produced unwanted side effects like EPS and thus that there was "a need in the art for antipsychotic drugs that produce fewer or less severe manifestations of these common side effects."  JX-2 at 1:51–60.  The '198 patent states that the disclosed compounds "are capable of producing antipsychotic effects and may be capable of affecting negative symptoms of schizophrenia in a beneficial manner.  In addition, many of the compounds may also have reduced tendencies to produce extrapyramidal side effects in mammals."  Id. at 111:14–19.

### 3.     Development of the '610 Patent

#### (a)     *Iloperidone-Induced QTc Prolongation*

15.     After the Hoechst scientists invented iloperidone, the drug was licensed to Novartis to develop.  Novartis, however, failed to obtain FDA approval, and abandoned further development of iloperidone, in part because Novartis discovered that iloperidone is associated with a potentially serious adverse side effect known as "QTc prolongation."  Tr. at 85:14–18 (Polymeropoulos); 366:11–368:4 (Economou); 529:24–530:3 (Ratain) (citing DTX-53 (Raggi)); PX-71 (May 11, 2011 Email from S. Uraizee to J. Economou).  The "QT interval" is the time

5

between the Q and T waves of the heart rhythm; corrected for the patient's heart rate, it is abbreviated "QTc." Tr. at 77:10–14 (Polymeropoulos). Drug-induced QT prolongation can increase the risk of cardiovascular side effects, including a serious arrhythmia called "Torsades de Pointes" (or "TdP"). *See, e.g.*, JX-1 ('610 patent) at 4:1–14; Tr. at 77:15–25 (Polymeropoulos); Tr. at 430:12–432:7 (Kaye); JX-3 (Fanapt Label (2014)) at 1, 3; JX-13 (Roxane Proposed Iloperidone Label (2014)) at 1, 2. In TdP, the heart rhythm becomes desynchronized and the heart is unable to pump blood, which can result in sudden death. Tr. at 232:7–233:4 (Preskorn). It is a silent condition;—seemingly healthy individuals can die of TdP without any prior warning. *Id.* Drug-induced QTc prolongation is of significant concern to FDA and has led to discontinuance of drug candidates found to prolong the QT interval. Tr. at 85:14–18 (Polymeropoulos); 918:20–919:3 (Roth).

### (b)    *Iloperidone Metabolism and CYP2D6*

16.    Dr. Mihael Polymeropoulos was one of the Novartis scientists who worked on iloperidone. At the time, he headed Novartis's program in pharmacogenetics, a discipline that studies the role of patients' genes in their reaction to various drugs. First at Novartis and then at Vanda (which he founded upon leaving Novartis, and of which he is the Chief Executive Officer), he investigated possible genetic causes for iloperidone-induced QTc prolongation. He studied some ten candidate genes, and 90 candidate variations in those genes that might affect the mechanism of action or drug metabolism, or might predispose patients to elongated QTc irrespective of iloperidone. Tr. at 90:17–91:21, 93:10–12 (Polymeropoulos).

17.    "Drug metabolism" refers to the processes by which biochemical reactions alter drugs within the body. This includes metabolism by a vast array of enzymes. Tr. at 949:14–21 (Guengerich). In the vocabulary of biology and medicine, an enzyme acts on a "substrate," and the resulting compound is called a "metabolite." Depending on the enzymatic activity, a

substrate and its resulting metabolite may have similar or very different properties. Tr. at 947:15–21 (Guengerich). Enzymes can also act in sequence, resulting in many different metabolites of the original drug. *Id*. One family of enzymes, residing mostly in the human liver, is the "cytochrome P450" family, sometimes abbreviated "CYP" or the "P450s." Within that family, two enzymes that happen to be involved in iloperidone metabolism are CYP2D6 and CYP3A4. Tr. at 946:15–25, 947:1–21 (Guengerich).

18.     As of the priority date for the '610 patent in 2004, very little was known publicly about iloperidone metabolism. Tr. at 967:7–25 (Guengerich). The chemical structure of iloperidone has 19 potential sites for even one type of metabolism—oxidative metabolism—and many other ways of being metabolized as well. Tr. at 949:14–21, 1007:16–17 (Guengerich). It is now known that iloperidone is metabolized by at least eleven CYP enzymes, with CYP3A4 and CYP2D6 the two primary CYP enzymes. Non-CYP enzymes also play a role in iloperidone metabolism. Tr. at 574:11–12 (Ratain); JX-18 (FDA Clinical Pharmacology and Biopharmaceutics Review(s)) at 6; Tr. at 950:9–951:5 (Guengerich); JX-3 (Fanapt Label (2014)) at 17; JX-13 (Roxane Proposed Iloperidone Label (2014)) at 19; JX-18 (FDA Clinical Pharmacology and Biopharmaceutics Review(s)) at 16.

19.     The ratio of the amount of two of the metabolites in the iloperidone metabolic pathway in the blood turns out to affect the risk of QTc prolongation in iloperidone patients: "P95" and "P88." Iloperidone is metabolized into P88 by a non-CYP process. Iloperidone is metabolized into P95 by the enzyme CYPD26 (which first creates an intermediate, "P94," which is further metabolized into P95). CYP2D6 also metabolizes P88, turning it into a compound known as "P28.2." The enzyme CYP3A4 also metabolizes iloperidone, producing a metabolite called "P89." JX-18 at 16.

20.     The efficacy of CYP2D6 varies significantly from person to person due to genetic variations.  Because of a common series of mutations, many people are "CYP2D6 poor metabolizers":  they produce less CYP2D6 enzyme or have less active CYP2D6 enzymes than does the general population.  JX-1 ('610 patent) at 1:53–61.  The variability in CYP2D6 functionality in the populace has led many pharmaceutical companies to cease development of potential drugs discovered to be significantly metabolized by CYP2D6.  Tr. at 991:10–13 (Guengerich).  Whether genetic variations in CYP2D6 efficacy will alter the performance or side-effect profile of the drug or both—or cause no change at all—depends on the extent to which the drug is processed by CYP2D6, whether other metabolic pathways will compensate for poor CYP2D6 metabolism, and whether the metabolites resulting from CYP2D6 activity have effects similar to, stronger, or weaker than the original drug.  *See, e.g.*, Tr. at 912:3–7 (Roth).

*(c)     The Invention of the '610 Patent*

21.     Polymeropoulous determined that genetic mutations for CYP2D6 were associated with an increased risk of iloperidone-induced QTc prolongation.  JX-1 ('610 patent).  In patients receiving 24 mg of iloperidone once a day, QTc prolongation was longer in CYP2D6 poor metabolizers, specifically those with an adenine ("A") DNA base at position 1846 in the CYP2D6 gene sequence instead of the normal guanine ("G"), known as the CYP2D6G1864A or *4 variant, and those with a thymine ("T") base at position 100 instead of the normal cytosine ("C"), known as the CYP2D6C100T or *10 variant.  The effect was seen in people with the mutation in only one chromosome (known as "heterozygous," "AG," or "CT") and in those with the mutation in both chromosomes ("homozygous, "AA," or "TT").  JX-1 at Table 6 (col. 8).

22.     Polymeropoulos and his co-inventor, Dr. Curt Wolfgang, also investigated the metabolites of iloperidone to determine how metabolism affected QTc prolongation.  They found that the ratio of P88 to P95 in the blood, and the ratio of (P88+iloperidone) to P95, correlated

with QTc.  Because CYPD26 both creates P95 and breaks down P88, it is now known that a patient with decreased CYP2D6 metabolism would have a substantially higher ratio of P88 to P95, and also a higher ratio of (P88+iloperidone) to P95, than would a normal metabolizer.  And because, as is known today, P88 and iloperidone itself activate the electric channels in the heart that cause QTc prolongation ("hERG channels") while P95 does not, a genotypic CYP2D6 poor metabolizer would have an increased risk of iloperidone-induced QTc prolongation.  JX-1 at Tables 8, 9 (col. 10).

23.    Polymeropoulos and Wolfgang invented a method to safely treat schizophrenia patients using iloperidone by: first, determining whether the patient was in a specialized at-risk population, namely genotypic CYP2D6 poor metabolizers; and second, administering a reduced dose of up to 12 mg/day (6 mg twice a day, or "b.i.d.") to those at-risk patients, and administering a normal dose of greater than 12 mg/day up to 24 mg/day to the non-genotypic CYP2D6 poor metabolizers.  *See, e.g.*, JX-1 at claims 1, 9, 13.

24.    Their invention led to the '610 patent, entitled "Methods for the Administration of Iloperidone," which issued on November 19, 2013, and claims priority to U.S. Provisional Application No. 60/614,798, filed on September 30, 2004.  JX-1.  FDA approved iloperidone based at least in part on the invention of this method to safely treat schizophrenia patients.  Tr. at 84:15–22 (Polymeropoulos).  The value of the invention is clear from Novartis's conduct:  when Polymeropoulos founded Vanda, Novartis–which had already abandoned iloperidone—sold it to Vanda for $500,000.  Four years later, after FDA approved the product, Novartis paid Vanda $200,000,000 to license the product back.  Tr. at 84:6–85:13 (Polymeropoulos).

**B.    Infringement**

**1.    The '198 Patent**

25.    Roxane concedes infringement of claim 3 of the '198 patent.  *See* D.I. 129.

Roxane will also induce, and contribute to, infringement of that claim when prescribers use Roxane's iloperidone.

### 2.    The '610 Patent

26.    Roxane's Proposed Label for iloperidone is, in all relevant ways, the same as Vanda's Fanapt Label.  Tr. at 368:11–16 (Economou), 373:15–374:4 (Smith); 569:21–23 (Ratain).  Although Roxane's corporate witness testified that Roxane has absolutely no idea how prescribers will actually use its drug if approved, Roxane agrees that its expectations for use are laid out in its Proposed Label.  Tr. at 368:24–369:17, 370:13–16, 371:17–372:1 (Economou).

> *(a)    "A method for treating a patient with iloperidone, wherein the patient is suffering from schizophrenia or a "psychotic disorder"* **(Claims 1–9, 11–13, 16)**

27.    Roxane's Proposed Label recommends that practitioners use iloperidone to treat patients suffering from schizophrenia.  JX-13 (Section 1).  Schizophrenia is a psychotic disorder.  *See* Joint Pretrial Order [D.I. 154], Ex. 1 (Joint Statement of Uncontested Facts) ¶ 19.

> *(b)    "internally administering" iloperidone "in an amount that is greater than 12 mg/day, up to 24 mg/day" to non-genotypic CYP2D6 PMs* **(Claims 1–9, 11–13, 16)**

28.    Roxane's Proposed Label is for iloperidone tablets.  Oral administration is "internal" administration as the Court has construed the claims.  Roxane's Proposed Label recommends administration of 12 to 24 mg/day to non-genotypic CYP2D6 poor metabolizers: "The maximum recommended dose is 12 mg twice daily (24 mg/day)."  JX-13 (Section 2.1); Order Construing the Terms of U.S. Patent No. 8,586,610 entered September 9, 2015 [D.I. 125].

> *(c)    administering iloperidone "in an amount that is 12 mg/day or less" to genotypic CYP2D6 PMs* **(Claims 1–9, 11–13, 16)**

29.    Roxane's Proposed Label recommends that practitioners administer 12 mg/day or less to genotypic CYP2D6 poor metabolizers.  Specifically, Section 2.2, Dosage and

Administration, Dosage in Special Populations, states that "Iloperidone dose should be reduced by one-half for poor metabolizers of CYP2D6 [see Pharmacokinetics (12.3)]."  JX-13; *see also* Tr. at 230:17-231:19 (Preskorn).

30.    Roxane's Proposed Label defines poor metabolizers of CYP2D6 or "CYP2D6 PMs" as <u>genotypic</u> CYP2D6 poor metabolizers.  Section 12.3, entitled Clinical Pharmacology, Pharmacokinetics, Metabolism and Elimination, states:  "Approximately 7% – 10% of Caucasians and 3% – 8% of black/African Americans lack the capacity to metabolize CYP2D6 substrates and are classified as poor metabolizers (PM), whereas the rest are intermediate, extensive or ultrarapid metabolizers."  JX-13.  Only genotypic CYP2D6 poor metabolizers "lack the capacity" to metabolize CYP2D6 substrates, Tr. at 173:2–24 (Kricka); *see also* 439:11–3 (Kaye), and the percentages given are for genotypic poor metabolizers, Tr. at 234:21–235:7 (Preskorn).  Roxane's Proposed Label goes on to distinguish genotypic CYP2D6 poor metabolizers from phenotypic CYP2D6 poor metabolizers, *e.g.*, patients whose metabolism of CYP2D6 substrates is slowed by co-administration of another drug known to inhibit CYP2D6 activity:  "Co-administration of iloperidone with known strong inhibitors of CYP2D6 like fluoxetine results in a 2.3-fold increase in iloperidone plasma exposure, and therefore one-half of the iloperidone dose should be administered.  Similarly, PMs of CYP2D6 have higher exposure to iloperidone compared with EMs and PMs should have their dose reduced by one-half. Laboratory tests are available to identify CYP2D6 PMs."  JX-13, § 12.3.

31.    Although one of Roxane's experts, Dr. Kaye, testified that the language "should have their dose reduced by half" is merely "educational" and not a recommendation or suggestion to reduce the dosage in CYP2D6 PMs, Roxane's other expert, Dr. Ratain, and Vanda's expert, Dr. Preskorn, testified that these words have their plain meaning and are a

recommendation to reduce the dosage in this patient population.  Tr. at 539:15–25, 548:12–16

(Ratain); 231:14–19 (Preskorn).  In clinical study protocols for its bioequivalence testing

submitted to FDA, Roxane itself agreed that "Iloperidone dose should be reduced by one-half . . .

for poor metabolizers of CYP2D6."  PX-90; PX-91; PX-92; PX-93.

> *(d)*      *determining if the patient has a CYP2D6 PM genotype by "performing or having performed a genotyping assay" (Claims 1–9, 11–13, 16)*

32.      Roxane's Proposed Label recommends that practitioners perform or have

performed a genotyping assay to determine whether patients are CYP2D6 poor metabolizers.

When section 12.3 refers to the fact that "Laboratory tests are available to identify CYP2D6

PMs" (JX-13), it is referring to genotyping assays, as Roxane's expert admitted.  Tr. at 566:25–

568:2 (Ratain).  The only commercially available laboratory tests to determine whether a patient

is a genotypic CYP2D6 poor metabolizer are genotyping tests.  Tr. at 566:25–568:2 (Ratain);

174:11–24, 187:9–14 (Kricka); 227:11–228:16; 234:5–235:13 (Preskorn).

> *(e)*      *"obtaining or having obtained a biological sample" (Claims 1–9, 11–13, 16); "extracting or having extracted genomic DNA or mRNA from the biological sample," "amplifying or having amplified a CYP2D6 region," "sequencing or having sequenced CYP2D6 DNA" (Claims 2–6); and wherein the "CYP2D6 poor metabolizer genotype is CYP2D6G1846A, including CYP2D6G1846A (AA) and CYP2D6G1846A (AG), or CYP2D6C100T, including CYP2D6C100T (TT) or CYP2D6C100T (CT) (Claims 2–6)*

33.      All commercially available laboratory tests to determine whether a patient is a

genotypic CYP2D6 poor metabolizer involve obtaining a biological sample from the patient,

extracting the genomic DNA or mRNA from that sample, amplifying the CYP2D6 region in the

extracted genomic DNA or mRNA, and sequencing that amplified CYP2D6 region.  Tr. at

190:14–193:12 (Kricka); 235:18–23, 236:15–19 (Preskorn).

34.      Dependent claims 2-6 specify particular CYP2D6-genetic variants, G1846A and

C100T.  All of the available tests include these particular variants in their results.  Tr. at 184:6–

185:22, 195:2–197:17 (Kricka); 237:1–15 (Preskorn).

      **(f)**      ***"the presence of a CYP2D6 poor metabolizer genotype indicates a risk of QTc prolongation" and the "risk of QTc prolongation is lower following internal administration of 12 mg/day or less"*** **(Claims 1–8, 13, 16)**

      35.      Section 5.2 of Roxane's Proposed Label, "QT Prolongation," states that in an open-label study, "iloperidone was associated with QTc prolongation of 9 msec at an iloperidone dose of 12 mg twice daily," that "under conditions of metabolic inhibition for both 2D6 and 3A4, iloperidone 12 mg twice daily was associated with a mean QTc increase from baseline of about 19 msec," and therefore "caution is warranted when prescribing iloperidone . . . in patients with reduced activity of CYP2D6 *[see Clinical Pharmacology (12.3)]*."  And Section 12.3 states that "PMs of CYP2D6 have higher exposure to iloperidone compared with EMs and PMs should have their dose reduced by one-half."  JX-13; Tr. at 231:20–234:4 (Preskorn).

**C.**      **Validity**

      **1.**      **Nonobviousness of the '198 Patent**

      **(a)**      ***Nature of the Problem and the Person of Ordinary Skill in the Art***

      36.      The parties generally agree that a person of ordinary skill in the art working in the field of the '198 patent would have an advanced degree in medicinal chemistry and/or pharmacology with some experience with the design and/or synthesis of antipsychotic drugs.  Tr. 676:7–15 (Sargent); 820:5–13 (Bartlett).

      37.      At the time of the invention, skilled artisans sought to invent an atypical antipsychotic.  Tr. 672:15–22 &719:22–720:12 (Sargent); 596:5–8 (Ratain); 767:22–768:2 (Strupczewski); 822:4–13 (Bartlett); 893:21–894:6 (Roth).  Medicinal chemists, including Roxane's expert Dr. Bruce Sargent, spent decades and considerable resources trying to find a successor to clozapine, without success.  Tr. 719:11–21 (Sargent); 894:3–7 (Roth).  The causes of atypical antipsychotic properties remained elusive.  Tr. at 729:9–16, 732:24–733:4 (Sargent).

**(b)      Roxane Has Not Demonstrated that a Skilled Artisan at the Time of the Invention Would Have Considered "Compound A" a Lead Compound**

38.      Roxane's obviousness theory is that in 1989, after Janssen Pharmaceuticals announced the discovery of risperidone, a skilled artisan searching for an atypical antipsychotic would have reached back to 1970 to an article in the *Journal of Medicinal Chemistry* by Robert Duncan and Helsley (JX-40), selected a compound identified therein, and modified it using "bioisosterism" techniques that Strupczewski identified in an article in the same journal in 1985 (fifteen years later), and by doing so would have discovered iloperidone.  Roxane's argument turns on the fact that risperidone is a benzisoxazole compound.  Strupczewski had shown that benzisoxazole groups can be bioisosteric to—that is, have similar biological activity to—the benzoyl component in butyrophenone compounds.  Dr. Sargent theorizes that a skilled artisan, spurred by the discovery of risperidone, would look back to find a butyrophenone compound and then replace its benzoyl moiety with a benzisoxazole moiety, with a reasonable expectation that doing so would result in an atypical antipsychotic.  Tr. at 692:10–12, 693:10–17.  As a matter of chemistry it is true that, for one butyrophenone in the 1970 Duncan & Helsley paper, replacing the benzoyl moiety with a benzisoxazole results in iloperidone.

39.      The record evidence, however, shows that this theory is based on hindsight—the record does not show that one of skill would be motivated to do what Roxane suggests with any reasonable expectation of success.  There is no evidence that the disclosure of risperidone would prompt a skilled artisan seeking an atypical antipsychotic to look at butyrophenone compounds that could be modified into benzisoxazoles.  There is no evidence that any skilled artisan actually did so at the time, for example, including Dr. Sargent himself.  He was searching for atypical antipsychotics at the time, and did not do what he now contends would have been obvious to do.  Tr. at 760:7–11 (Sargent).  With good reason.  There was no expectation that the benzoyl

14

moieties of butyrophenones conferred atypical antipsychotic properties, or that substituting in a benzisoxazole moiety would create or preserve that activity.  Tr. at 839:21–25 (Bartlett).  Indeed, Strupczewski's 1985 paper (JX-26) showed that the benzisoxazoles in that paper were <u>not</u> atypical antipsychotics.  Tr. at 779:1–6 (Strupczewski)*; see also* Tr. at 930:10–931:17 (Roth).  If anything, a skilled artisan would consider <u>removing</u> the benzisoxazole moiety from risperidone as a fruitful avenue.  Tr. at 837:5–839:20 (Bartlett).

40.     Nor would a skilled artisan have been motivated to start with one particular compound from nineteen years earlier.  Roxane calls that compound as "Compound A," and calls another compound from the same 1970 paper as "Compound B."  Roxane's argument is this:  Duncan & Helsley's 1970 paper (JX-40) identified many compounds, but two of them—Compounds A and B—were the most promising.  Compound B was investigated thereafter as a potential antipsychotic, under the name "lenperone."  From this, Roxane theorizes that in 1989, after risperidone became known, a skilled artisan would have gone back to experiment with Compound B's "close friend," Compound A (the real-world name of which was "AHR-2244").

41.     This makes no sense.  Roxane admits that "the starting point for a lead would be a compound that had the right sort of activity in the first place."  Tr. at 662:6–12 (Sargent).  A skilled artisan, then, would have started with a known <u>atypical</u> antipsychotic lead compound, such as clozapine or sulpiride, modifying it in hopes of developing an improved atypical antipsychotic.  Tr. at 823:22–824:7, 832:8–21 (Bartlett).  Indeed, several companies, including Sargent's Boots Pharmaceuticals, did just that.  Tr. at 734:9–737:21, 757:24–759:12 (Sargent); 832:8–834:15 (Bartlett).  "Compound A," in contrast, would have been a poor choice.  It was not known to be an antipsychotic, much less have <u>atypical</u> antipsychotic properties.  Rather, it was known to have tranquilizing activity and strong sedative effects, neither of which suggests its use

as an antipsychotic.  *See* Tr. at 898:20–903:23 (Roth) (citing DTX-143 (Duncan '810 Patent);

JX-40 (Duncan & Helsley, J. Med. Chem. (1970); JX-63 (DeVanzo (1966)); 905:22–907:6

(Roth) (citing JX-66 (Johnson (1974))).  Moreover, it was known to induce catalepsy akin to that

of haloperidol, further undermining its appeal as a potential <u>atypical</u> antipsychotic.  Tr. at

904:24–905:3, 906:12–18 (Roth) (citing JX-66 (Johnson (1974))).  Indeed, Sargent admits

Compound A would not be expected to have atypical antipsychotic activity.  Tr. at 729:9–18

(Sargent).

42.     None of this is altered by the fact that Compound A was first disclosed alongside

lenperone, Roxane's "Compound B."  Lenperone was a disaster.  In an open-label clinical trial

published in 1975, the ten patients treated with lenperone experienced nineteen serious cardiac

side effects—nearly two events per patient.  Tr. at 908:7–910:3 (Roth) (citing PX-137 (Harris

(1975)); 754:10–16 (Sargent).  And lenperone was associated with moderate sedation, and

possible EPS.  Tr. at 754:17–755:6 (Sargent).  No one seeking an atypical antipsychotic in 1989

would have looked to Compound A because of lenperone; if anything, that relationship would

cause one to run <u>away</u> from Compound A.  Tr. at 910:5–12 (Roth).

### (c)     *Roxane Has Not Demonstrated that a Bioisosteric Modification Would Have Solved the Problem*

43.     Even if a skilled artisan happened to start with Compound A in 1989, there would

be no motivation to make the bioisosteric substitution on which Roxane's argument turns.  Many

possible modifications to butyrophenones were known.  Tr. at 825:24–830:1 (Bartlett).

Bioisomerism is just one tool in the box used to modify lead compounds.  Tr. at 664:24–665:11

(Sargent); 839:16–25 (Bartlett).  And replacing the benzoyl component with a benzisoxazole

component would not have commended itself to a skilled artisan because benzisoxazoles were

not known to confer atypicality properties on otherwise-typical antipsychotics.  Tr. at 779:1–6

16

(Strupczewski); 839:20–840:15 (Bartlett).  Indeed, Roxane has pointed to no evidence that benzisoxazole modifications were then known to solve any of the demonstrated side effects associated with AHR-2244 (Roxane's Compound A) and lenperone (Roxane's Compound B).

### 2.      Nonobviousness of the '610 Patent

#### (a)      Nature of the Problem and the Person of Ordinary Skill in the Art

44.      Those of skill in the art have sought to discover and commercialize novel atypical antipsychotics for over thirty years.  Today, the annual market for atypical antipsychotics is about $10 billion.  Tr. at 615:25–616:2 (Ratain).  Iloperidone occupies an important niche, offering lesser degrees of EPS and akathisia.  Tr. at 111:23–112:8 (Polymeropoulos).

45.      Novartis abandoned iloperidone in development, however, because of QTc prolongation.  Tr. at 85:14–18 (Polymeropoulos); 366:11–368:4 (Economou); 529:23–530:3 (Ratain) (citing DTX-53 (Raggi)); PX-71 (May 11, 2011 Email from S. Uraizee to J. Economou).  There was a need to find a way to lower the risk of iloperidone-associated QTc prolongation so that schizophrenia patients could benefit from its otherwise-favorable profile.

46.      The parties disagree about the level of skill of an ordinarily skilled artisan. Roxane contends that a skilled artisan would understand pharmacogenetics because the '610 patent is about pharmacogenetics, Tr. at 512:6–12 (Ratain); Vanda contends that the '610 patent is about methods of treating schizophrenia patients using iloperidone, and thus a skilled artisan would need to be qualified to administer antipsychotics to patients but would not need a pharmacogenetics background.  The difference is insignificant, however; Roxane's expert admits his opinion would not change under either articulation.  Tr. at 515:20–23 (Ratain).

> **(b)** *Roxane Has Not Demonstrated that a Person of Skill in the Art Would Be Motivated to Study the Risk of QTc Prolongation in Genotypic CYP2D6 Poor Metabolizers as the Prior Art Did Not Recognize the Importance of CYP2D6 in Metabolism of Iloperidone*

47.     Roxane asserts it would have been obvious to study the implications for iloperidone metabolism of mutations in the genes for the CYP2D6 enzyme.  This is hindsight.  Any number of genetic variants could have explained why some iloperidone patients experience QTc prolongation while others do not, including variants in genes involved in (1) the mechanism of action, (2) the genetic predisposition to long-QT, and (3) the elimination or metabolism.  *See, e.g.*, Tr. at 91:2–21 (Polymeropoulos).  Alternatively, there could have been no genetic component at all.  *Id*.  The prior art does not teach or suggest that CYP2D6 poor metabolizers have an increased risk of iloperidone-induced QTc prolongation.

48.     Dr. Ratain testified that the '610 patent invention is obvious, in part, because it was known that CYP2D6, a highly polymorphic enzyme, is important for the metabolism of iloperidone, and therefore it would be obvious to try "to figure out how important it's likely to be."  Tr. at 532:22–25 (Ratain) (citing JX-68 (Mutlib (1998))).  The record evidence does not support this theory.  The prior art does not teach that CYP2D6 is important in iloperidone metabolism in the body (*in vivo*).  Tr. at 967:7–25, 968:13–17 (Guengerich).  Although JX-68 (Mutlib (1998)) discloses that CYP2D6 plays a role in metabolizing iloperidone *in vitro* to P94, the authors did not recover any meaningful amounts of P94 *in vivo*.  *Id*. at 5; Tr. at 592:18–593:14 (Ratain).  The authors hypothesized that P94 may be further converted to "Compound 5" (now known as P36.3, *see* JX-18 (FDA Clinical Pharmacology and Biopharmaceutics Review(s)) at 16; Tr. at 950:20–24 (Guengerich)) based on analysis of metabolites isolated from plasma and urine.  JX-68 (Mutlib (1998)) at 5.  After the publication of JX-68 (Mutlib (1998)), however, no further work on "Compound 5" was reported.  Tr. at 956:21–957:8 (Guengerich).

Indeed, Ratain concedes that there is nothing in the prior art that teaches that P94 is converted to a major iloperidone metabolite.  Tr. at 575:18–576:7 (Ratain); *see also* Tr. at 963:15–25, 968:21–24 (Guengerich) (discussing DTX-51 (Subramanian (2002)), which discloses P88 and P95 as the main iloperidone metabolites without any supporting data).

49.    Subsequent reviews of the literature—PX-154 (Caccia (2002)), JX-95 (Kirchheiner (2004)), and DTX-53 (Raggi (2004))—discuss CYP2D6 metabolism and various drugs, including iloperidone, but do not categorize iloperidone as being primarily or significantly metabolized by CYP2D6.  *See* Tr. at 958:1–3, 963:2–9, 966:20–967:6 (Guengerich).  Indeed, Roxane has not cited any prior art that discloses the significance of CYP2D6 to iloperidone metabolism *in vivo*.  As such, no prior art would motivate a skilled artisan to study possible associations between CYP2D6 metabolism and any side effect, including QTc prolongation.

### (c)    Roxane Has Not Demonstrated that a Skilled Artisan Would Have Any Expectation that Dosage Adjustment for CYP2D6 Poor Metabolizers Would Reduce Side Effects

50.    Knowing that CYP2D6 played an important role in iloperidone metabolism would not drive a skilled artisan to investigate a dosage adjustment to reduce side effects.  *See, e.g.*, Tr. at 911:16–23 (Roth).  Even where CYP2D6 is one of the enzymes involved in metabolizing a drug, it is often the case that no dosage adjustment is needed for CYP2D6 poor metabolizers.  *See, e.g.*, DTX-122 (Kirchheiner (2001)) at 9; Tr. at 607:2–17, 607:25–608:4 (Ratain).

51.    The effect of CYP2D6 poor metabolism on the pharmacokinetics varies unpredictably from drug to drug.  CYP2D6 poor metabolism "may of course activate alternative, otherwise dormant, and possibly less effective, pathways, and yield otherwise atypical metabolites." JX-79 (Shah (2004)) at 7; *see also* Tr. at 912:3–13 (Roth); 611:13–25 (Ratain).  It was unpredictable whether any dosage adjustment would be needed for CYP2D6 poor metabolizers and, if so, how much of an adjustment, to achieve the pharmacokinetic profile seen

19

in normal metabolizers.  *See, e.g.*, Tr. at 605:7–606:3 (Ratain) (citing JX-95 (Kirchheiner (2004)) at 11); 609:15–610:24 (Ratain) (citing JX-79 (Shah (2004)) at 7); 938:6–16 (Roth).

52.     Nor was it predictable that a dose adjustment would reduce QTc prolongation. Not all side effects are dose-dependent.  Tr. at 939:16–22 (Roth).  For some drugs, the parent drug and the metabolites have the same biological activity, and thus the side effects are the same irrespective of metabolism; for other drugs, a metabolite could actually cause the side effect, so poor metabolism is, in that sense, beneficial.  For both sertindole and haloperidol, for example, no dosage adjustment is needed in CYP2D6 poor metabolizers even though their pharmacogenetics profile is different than that of normal metabolizers.  *See* JX-79 (Shah (2004)) at 12; Tr. at 912:25–914:24 (Roth); 988:18–24, 1007:1–1008:5 (Guengerich).

53.     Even for the same drug, the impact of metabolism can vary from side effect to side effect.  This is true for iloperidone itself.  The Novartis 0104 study showed that genotypic CYP2D6 poor metabolizers tolerated iloperidone equally well (including with respect to EKG heart parameters) and that CYP2D6 extensive metabolizers actually had twice as many side effects.  Tr. at 100:15–25 (Polymeropoulos).  Similarly, Vanda's 3101 study demonstrated that CYP2D6 extensive metabolizers had similar frequency for most side effects; for some side effects, extensive metabolizers had a higher frequency of side effects than PMs.  Tr. at 110:15–111:14 (Polymeropoulos) (citing PX-67 (Study 3101 Adverse Event Frequency)).

54.     Without any meaningful way to predict whether dosage adjustments for CYP2D6 poor metabolizers would lead to reduced side effects, and when dealing with a side effect as potentially serious as QTc prolongation, one of skill in the art would not be motivated to adjust the dose of the drug, but instead would discontinue use of the drug.  As Dr. Roth testified: "when we saw prolongation of a QT interval that was induced by a drug, we stopped the drug.

We did not give -- we did not lower the dose.  We stopped it."  Tr. at 939:2–15 (Roth).

> ### (d)  It Was Unpredictable Whether Reducing the Dose of Iloperidone for CYP2D6 PMs Would Reduce the Risk of QTc Prolongation Because the hERG Liability of Iloperidone and Its Metabolites Was Unknown and Unpredictable

55.     Today, it is known why the invention claimed in the '610 patent works: iloperidone, P88, and P95 have differing effects on what is known as the "hERG channel," an ion channel involved in the cardiac cycle.  *See* Tr. at 918:2–25 (Roth) (defining hERG and its QT implications).  Both iloperidone itself and P88 are relatively powerful inhibitors of hERG, and therefore can cause QT prolongation, while P95 is not a hERG inhibitor.  Tr. at 102:10–13 (Polymeropoulos) (citing JX-30 (Study 2328 PG Report) at 6); 917:1–25 (Roth) (citing JX-19 (FDA Pharmacology Review) at 30).  Patients who are CYP2D6 poor metabolizers have more iloperidone and P88 in their blood and less P95, and are at higher risk of QTc prolongation.

56.     In 2004, however, it was not known whether it was iloperidone or one, some, or all of its metabolites that inhibit the hERG channel or affect QTc prolongation.  Tr. at 620:3–7 (Ratain); 969:22–970:3 (Guengerich); 920:24–921:1 (Roth).  The chemical differences between iloperidone, P88, and P95 are trivial, while the difference in their effect is significant.  The similarity of their structures makes it impossible to predict the difference in their effects, in 2004 and today.  Tr. at 915:22–916:2, 919:10–13 (Roth).  Indeed, a tool used to predict hERG inhibition, "Open Virtual Tox Lab," predicted that all three compounds would be weak hERG inhibitors, a prediction that is wrong for iloperidone and P88.  Tr. at 920:1–21 (Roth).  Without knowing the effects on the hERG channel of iloperidone, P88, and P95, there would be no reason to expect that a dosage adjustment would reduce QTc risk.  Tr. at 1008:6–10 (Guengerich).

> ### (e)  The '610 Patent Invention Is Not Routine and Conventional Work That Was Obvious to Try Based on FDA Guidance

57.     The experts agree that it is unpredictable whether dosage adjustments for

CYP2D6 poor metabolizers are necessary, and if so, what dosage adjustment would reduce the risk of QTc prolongation. The appropriate dosage of iloperidone cannot be determined without empirical research. *See, e.g.*, Tr. at 524:24–525:4 (Ratain). Roxane argues, however, that it does not matter if the precise dosage adjustment was unpredictable, because a skilled artisan would naturally stumble upon the invention in performing FDA-mandated, routine-and-conventional clinical studies. Tr. at 604:13–19 (Ratain).

58.     The evidence refutes this. Roxane's study-design expert, Dr. Charles McCulloch, agrees that clinical-study design is <u>not</u> routine or conventional. *See* Tr. at 629:15–21, 649:19–650:7. And while its other expert, Ratain, testified that all one needs to determine the necessary dosage adjustment for CYP2D6 poor metabolizers is (i) common sense, (ii) basic medical training (including teachings from Goodman & Gilman's textbook (DTX-79)), (iii) FDA Guidance documents, and (iv) some other literature, specifically Kirchheiner (2001) (DTX-122) and Shah (2004) (JX-79). Tr. 522:18–523:5, 523:20–524:23, Ratain had to admit that Novartis had all four of those things and yet its clinical trials did not find the link between QTc prolongation and CYP2D6 metabolism. Tr. at 617:18–618:19 (Ratain). Instead, Novartis's 0104 study showed that CYP2D6 extensive metabolizers exhibited twice as many side effects as poor metabolizers, and that a dose reduction would not be necessary. Tr. at 100:15–25 (Polymeropoulos). Novartis looked at electrocardiograms for its trial participants, yet did not find that PMs were at higher risk for QT prolongation. Tr. at 99:19–100:4, 101:1–3 (Polymeropoulos) (citing JX-27 (Study 0104)).

### (f)     Secondary Considerations of Nonobviousness

59.     There was a long-felt but unmet need for atypical antipsychotics with fewer side effects such as akathisia. Tr. at 80:1–10, 81:1–82:11,, 112:9–11 (Polymeropoulos); PX-192 (CATIE Study). Yet Novartis, motivated to succeed and with enormous resources, failed to

perceive what Ratain now says is obvious and failed to bring iloperidone to market because of its association with QTc prolongation. PX-71 (May 11, 2011 Email from S. Uraizee to J. Economou); Tr. at 85:14–18 (Polymeropoulos); 366:11–368:4 (Economou). Instead, Novartis abandoned iloperidone and sold it to Vanda for an up-front payment of $500,000. Tr. at 84:6– 85:13 (Polymeropoulos).

60.     Based at least in part on Polymeropoulos's and Wolfgang's invention to safely and effectively treat patients suffering from schizophrenia, Vanda was able to get FDA approval for iloperidone. Tr. at 84:15–22 (Polymeropoulos). After iloperidone was FDA approved, Novartis paid Vanda $200,000,000 to reacquire rights to iloperidone and to market FANAPT® in the U.S. Tr. at 84:6–85:13 (Polymeropoulos). The forty-fold increase in Novartis's valuation of the franchise suggests that the work by the '610 inventors in those four years was not obvious.

### 3.     Subject Matter Eligibility of the '610 Patent

#### (a)     *Roxane's Law of Nature Is Not a Law*

61.     Roxane originally posited a natural law that "where a patient poorly metabolizes a drug, the patient should receive less drug." [D.I. 9, C.A. No. 14-757, at 11; *see also* D.I. 133 at 4.] Roxane abandoned this because it is wrong. For example, CYP2D6 poor metabolizers receiving prodrugs that are primarily metabolized by CYP2D6 to their active metabolites do not necessarily need to receive less of the prodrug. [D.I. 11, C.A. No. 14-757, at 7; D.I. 13, C.A. No. 14-757, ¶ 41; D.I. 140, C.A. No. 13-1973, at 2.]

62.     At trial, Roxane's Dr. Ratain testified that "it is a natural law that the more iloperidone you have in your system the higher the side effects would be." Tr. at 582:23–583:2. That, too, is wrong. Novartis's 0104 study showed the opposite: CYP2D6 extensive metabolizers (EMs), who would have less iloperidone in their systems, had twice as many side effects as poor metabolizers (PMs). Tr. at 100:15–25 (Polymeropoulos) (citing JX-27). Vanda's 3101 study

further demonstrated increased side-effect levels in EMs than PMs for some side effects, and equal side-effect levels for others.  Tr.10:15–111:14 (Polymeropoulos) (citing PX-67 (Study 3101 Adverse Event Frequency)).

63.     Perhaps recognizing he was wrong, Ratain later identified two laws of nature supposedly embodied in the'610 patent:  (1) "we have sequence variation, and that sequence variation leads to the presence or absence of CYP2D6 activity, functional CYP2D6 enzymes in a patient's liver;" and (2) "whether or not they have CYP2D6 affects how they metabolize iloperidone."  Tr. at 621:19–622:2 (Ratain).  In other words, Roxane's "laws of nature" are that mutations in the CYP2D6 genes can alter enzymatic activity, and a patient's CYP2D6 enzymatic activity affects their metabolism of iloperidone.  The '610 patent does not claim either of those medical facts.  It is true that the claims of the '610 patent depend, in part, on how the body metabolizes iloperidone, but all method-of-treatment claims depend on natural processes.  The claims of the '610 patent are directed to useful applications of those natural processes: how genotypic CYP2D6 poor metabolizers can safely be treated with specified dosage ranges of iloperidone.  The U.S. Patent Office explicitly considered subject matter eligibility of the '610 patent claims in light of *Mayo Collaborative Servs.* v. *Prometheus Labs., Inc.*, 132 S. Ct. 1289 (2012) and upheld the patentability of the claims.  [D.I. 148, C.A. No. 14-757, at 1 n.1.]  *See also* Tr. at 521:12–17 (Ratain); JX-94 ('610 patent file history).

### (b)     *Roxane Has Not Demonstrated that Determining the Correct Dosage Adjustment for CYP2D6 Poor Metabolizers Is Routine or Conventional*

64.     Ratain's opinions under sections 101 and 103 are related:  "they were obvious experiments designed to ascertain the law of nature experiments, and then once one ascertained the law of nature, to use routine approaches to define the dosing based on the law of nature."  Tr. at 527:4–8.  As discussed above, the invention of the '610 patent is not routine or conventional.

24

Novartis's failure to figure out the problem solved by the inventors of the '610 patent is evidence

of that.  Tr. at 85:14–18 (Polymeropoulos); 366:11–368:4 (Economou); 529:23–530:3 (Ratain)

(citing DTX-53 (Raggi)); PX-71 (May 11, 2011 Email from S. Uraizee to J. Economou).

### 4.    Written Description of the '610 Patent

#### (a)    *Roxane Has Not Demonstrated that the '610 Patent Does Not Describe Dosing CYP2D6 Poor Metabolizers at 12 mg/day or Less*

65.    Roxane's written-description theory is that there is no support for a dosage range

of 12 mg/day or less.  Tr.at 535:24–536:2, 5419–17 (Ratain), 630:6–9 (McCulloch).  That is

wrong.  The '610 patent explicitly discloses this range.  *See, e.g.*, JX-1 at 11:25–28 ("if a patient

has a 'poor metabolizer' genotype, or has a high P88:P95 or (iloperidone+P88):P95 ratio, the

patient's dose of iloperidone may be reduced by, for example, 25%, 50%, or 75%"); 9:42–47

("an individual with a genotype associated with decreased CYP2D6 activity may receive a

reduced dosage of 18, 12, or 6 mg per day"); 9:34–42.  Table 3 of the '610 patent (JX-1 at

70:50–60) demonstrates that CYP2D6 poor metabolizers ("AA" and "AG") have 1.5 to 3.5x

higher P88 concentrations than non-poor metabolizers, which supports a 1.5 to 3.5 reduction in

dose for CYP2D6 poor metabolizers.  Tr. at 106:16–107:17 (Polymeropoulos).

#### (b)    *Roxane Has Not Demonstrated that the Study Results of the '610 Patent Do Not Support the Claims*

66.    Roxane's expert McCulloch testified that the '610 patent is not supported because

the claims are based on indirect relationships that lack statistical significance.  Tr. at 637:23–25.

McCulloch admitted that he is not a person of skill in the art.  Tr. at 622:13–623:4.  Nor did he

testify whether the '610 patent specification reasonably conveyed to a skilled artisan that the

inventors possessed the claimed invention.  *See, e.g.*, Tr. at 618:8–10, 622:5–8.  While he

criticizes the statistical significance of the data, he admits that the '610 patent discloses a trend

for higher QTc prolongation among genotypic CYP2D6 poor metabolizers given a 24 mg daily dose. Tr. at 647:22–648:2 (McCulloch) (citing Table 6 of the '610 patent (JX-1 at 8:50–66)).

67.     In addition, Drs. Polymeropoulos and Wolfgang determined that the intermediate biomarkers for CYP2D6 poor metabolism, *i.e.*, the ratios of P88 to P95 and P88 to P95 concentrations in the blood, correlated to higher QTc, and thus supported the conclusion that genotypic CYP2D6 poor metabolizers had increased risk of QTc prolongation. Tr. at 976:19–977:13 (Guengerich) (citing the '610 patent at Tables 8, 9, respectively (JX-1 at col. 10)). Analyses of intermediate biomarkers are routinely and reliably used to establish a link between a genotype and a condition. Tr. at 972:9–973:15 &977:7–13 (Guengerich).

**D.     Relief**

**1.     Effective Date of Approval: § 271(e)(4)(A)**

68.     The '610 patent expires on November 2, 2027 and the '198 patent expires on November 15, 2016. Upon this Court's judgment that the '610 or '198 patents are valid and infringed, Plaintiffs will be entitled to an Order of this Court that the effective date of approval for Roxane's ANDA shall be no earlier than November 2, 2027.

**2.     Injunction: §§ 271(e)(4)(B) and 283**

69.     Roxane's generic iloperidone would be a direct competitor to Fanapt®. Without an injunction, Plaintiffs would suffer an incalculable loss of market share and Roxane's generic iloperidone would erode the price for Fanapt®. Vanda would also suffer irreparable harm from being unable to use lost Fanapt® revenue to invest in research and development of new clinical indications for and formulations of Fanapt® and development of other drugs. Tr. at 113:5–114:11. These irreparable harms would be the direct result of Roxane's sales.

## II.     Proposed Conclusions of Law

## A.     Jurisdiction and Venue

70.     The Court has subject matter jurisdiction over Plaintiffs' patent-infringement claims under 28 U.S.C. §§ 1331 and 1338(a).  *See* D.I. 106.  Roxane does not contest personal jurisdiction.  Venue is proper under 28 U.S.C. §§ 1391(b), (c), and (d), and 1400 (b).

## B.     Infringement

71.     Roxane does not contest infringement of claim 3 of the '198. *See* October 19, 2015 Joint Stipulation [D.I. 129].

72.     Under 35 U.S.C. § 271(e)(2)(A), it is an act of infringement to file an ANDA application "for a drug claimed in a patent or the use of which is claimed in a patent." Roxane's submission of a paragraph IV certification for the '610 patent is an act of infringement.  *See, e.g.*, *Bristol-Myers Squibb Co.* v. *Royce Labs.*, 69 F.3d 1130, 1131 (Fed. Cir. 1995).  This is true even though the '610 patent was belatedly listed in the Orange Book.  *See Merck Sharp & Dohme Corp.* v. *Sandoz, Inc.*, No. 12-3289 (PGS), 2013 WL 591976, *4 (D.N.J. Feb. 14, 2013).

73.     Roxane may also be liable for induced and contributory infringement, *see Allergan, Inc.* v. *Alcon Labs., Inc.*, 324 F.3d 1322, 1331 (Fed. Cir. 2003), which is determined even in a Hatch-Waxman lawsuit context "by traditional patent infringement analysis," *Warner-Lambert Co.* v. *Apotex Corp.*, 316 F.3d 1348, 1365 (Fed. Cir. 2003).  The requisite intent, that Roxane had the intent to bring about the desired result, *see Commil USA, LLC* v. *Cisco Systems, Inc.*, 135 S. Ct. 1920, 1922, 1926 (2015), may be inferred from its Proposed Label.

74.     Roxane argues that because some prescribers of iloperidone will not follow the steps of the '610 patent—either by not genotyping their patients, or by not exceeding 12mg per day even in non-poor metabolizers—Roxane does not induce infringement.  That is wrong.  "[I]t is irrelevant that some users may ignore the warnings in the proposed label.  The pertinent

question is whether the proposed label instructs users to perform the patented method. If so, the proposed label may provide evidence of [Roxane]'s affirmative intent to induce infringement." *AstraZeneca LP* v. *Apotex, Inc.*, 633 F.3d 1042, 1060 (Fed. Cir. 2011). All that is required is that the label teach, suggest, promote, recommend, or instruct a physician to engage in the steps that constitute direct infringement. *See Takeda Pharm. U.S.A., Inc.* v. *West-Ward Pharm. Corp.*, 785 F.3d 625, 631 (Fed. Cir. 2015). Roxane's Proposed Label recommends that prescribers perform each step of the claimed methods, including genotyping their patients and administering up to 12 mg/day of iloperidone to genotypic CYP2D6 poor metabolizers. *See supra* I.B.(2). Thus, Vanda has proven induced and contributory infringement by a preponderance of the evidence.

## C.   Validity

### 1.   Presumption of Validity; Burden to Prove Clear and Convincing Evidence

75.   Each claim of a patent is accorded a statutory presumption of validity. 35 U.S.C. § 282; *Microsoft Corp.* v. *i4i Ltd. P'ship*, 131 S. Ct. 2238, 2243 (2011). As a result, Roxane must prove each fact underlying its invalidity defenses by clear and convincing evidence. *Microsoft*, 131 S. Ct. at 2243.

### 2.   Nonobviousness

76.   Obviousness is a legal determination based on underlying factual inquiries: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; (3) the differences between the claimed subject matter and the prior art; and (4) objective indicia of non-obviousness. *Graham* v. *John Deere Co.*, 383 U.S. 1, 17–18 (1966). Roxane "must demonstrate by clear and convincing evidence that a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the skilled artisan would have had a reasonable expectation of success in doing so." *InTouch Techs., Inc.* v. *VGo Commc'ns., Inc.*, 751 F.3d 1327, 1347–49 (Fed. Cir. 2014) (internal quotation marks and

citation omitted).  The use of hindsight is not permitted.  *Otsuka Pharm. Co.* v. *Sandoz, Inc.*, 678 F.3d 1280, 1296 (Fed. Cir. 2012) ("the inventor's own path itself never leads to a conclusion of obviousness; that is hindsight.").  "Mere identification in the prior art of each component of a composition does not show that the combination as a whole lacks the necessary attributes for patentability, *i.e.*, is obvious." *Eli Lilly & Co.* v. *Zenith Goldline Pharm., Inc.*, 471 F.3d 1369, 1379 (Fed. Cir. 2006).

### (a)    The '198 Patent

77.    Determining whether a compound would have been obvious over prior art compounds generally follows a two-part inquiry:  first, "whether a chemist of ordinary skill would have selected the asserted prior art compounds as lead compounds, or starting points, for further development efforts;" and second, "whether the prior art would have supplied one of ordinary skill in the art with a reason or motivation to modify a lead compound to make the claimed compound with a reasonable expectation of success." *Otsuka*, 678 F.3d at 1291–92.

### (1)    A person of skill in the art would not have selected AHR-2244 (Compound A) as a lead to arrive at an atypical antipsychotic

78.    A lead compound is "a compound in the prior art that would be most promising to modify in order to improve upon its . . . activity and obtain a compound with better activity." *Id.* at 1291 (internal quotations omitted).  Whether a compound is an appropriate lead requires comparing the relevant properties of the lead and patented compounds.  *See id.* at 1292.  It is not enough that the prior art compound and the invented compound bear "structural similarity." *Id.* Rather, "proving a reason to select a compound as a lead compound depends on more than just structural similarity, but also knowledge in the art of the functional properties and limitations of the prior art compounds.  Potent and promising activity in the prior art trumps mere structural relationships." *Daiichi Sankyo Co.* v. *Matrix Labs., Ltd.*, 619 F.3d 1346, 1354 (Fed. Cir. 2010)

(internal citation omitted).

79.     The record evidence is clear that while medicinal chemists across the industry pursued an atypical antipsychotic, the pursuit was unpredictable and presented hundreds, if not thousands, of options for lead compounds. *See supra* I.C.(1)(b). The sheer number of possible lead compounds undermines Roxane's assertion of obviousness. *See Bayer Schering Pharma AG* v. *Barr Labs., Inc.*, 575 F.3d 1341, 1347 (Fed. Cir. 2009) ("*KSR* requires the number of options to be 'small or easily traversed." (internal quotation marks and citation omitted)). Roxane's argument that a skilled artisan would have selected AHR-2244 (Compound A) is belied by the evidence. AHR-224 was not known to possess the properties or characteristics a person seeking to develop an atypical antipsychotic would desire. *Supra* I.C.(1)(b); *see also Otsuka*, 678 F.3d at 1292. Given the complete absence of evidence that AHR-2244 has atypical antipsychotic activity, it is an improbable starting point for a skilled artisan. *See Otsuka*, 678 F.3d at 1295 (prior art failed to tie the compound "to any <u>meaningful</u> suggestion of antipsychotic activity" (emphasis added)). Indeed, Sargent, Roxane's expert, was himself pursuing an atypical antipsychotic in 1989 yet he did not do what he now claims was obvious. *See supra* ¶ 39.

80.     Roxane argues that skilled artisans would have been led to Compound A because its "sibling" in the Duncan & Helsley 1970 paper, lenperone (Roxane's "Compound B"), had been investigated as an antipsychotic. But lenperone was abandoned in early-stage clinical trials because the volunteers who took it had heart attacks. *See supra* I.C.(1)(b). A skilled artisan looking for a lead compound would not select the "sibling" of a drug as dangerous as lenperone. *Daiichi*, 619 F.3d at 1354 ("it is the possession of promising useful properties in a lead compound that motivates a chemist to make structurally similar compounds."). Lenperone taught away from using Compound A. *See Takeda Chem. Indus., Ltd.* v. *Alphapharm Pty., Ltd.*,

492 F.3d 1350, 1359 (Fed. Cir. 2007) ("Significantly, the closest prior art compound . . .

exhibited negative properties that would have directed one of ordinary skill in the art away from

that compound.").

81.     Moreover, Roxane cannot show by clear and convincing evidence that a skilled

artisan would start with AHR-2444, because the evidence shows that a skilled artisan would

start—as Sargent himself started—with a compound known to have <u>atypical</u> antipsychotic

properties.  *See Bayer*, 575 F.3d at 1347; *Takeda Chemical*, 492 F.3d at 1358 (affirming district

court's holding that person of skill would not select asserted lead compound because prior art

disclosed different compounds that would be more promising starting points).

### (2)     *A person of skill in the art would not have modified AHR-2244 (Compound A) with a bioisosteric moiety*

82.     Even assuming that a skilled artisan would have started with AHR-2244, there is

no clear, convincing evidence (or any evidence) that the artisan would have been motivated to

attempt a bioisosteric modification with a reasonable expectation of success.  Chemists use

bioisosteric changes to modify compounds while <u>preserving</u> the activity of the compound.  *See*

*supra* ¶ 43.  Thus, a skilled artisan seeking to turn AHR-2244 into an atypical antipsychotic

would not be motivated to make a bioisosteric change; because AHR-2244 was not itself known

to be an atypical antipsychotic, a chemical substitution expected to induce no substantive change

would not make sense.  *See Sanofi-Synthelabo* v. *Apotex, Inc.*, 550 F.3d 1075, 1088 (Fed. Cir.

2008) (holding that district court's finding that manipulation of molecule was unpredictable

supported nonobviousness ruling); *contrast Eisai Co.* v. *Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353,

1358 (Fed. Cir. 2008); *Daiichi*, 619 F.3d at 1357.  In *Takeda Chemical*, the Federal Circuit

affirmed the rejection of an obvious defense based on a proposed chemical modification that

"had no tendency to decrease unwanted side effects," finding that "researchers would have been

inclined 'to focus research efforts elsewhere.'" 492 F.3d at 1361 (internal quotations and citation omitted).

83.     It is undisputed that a skilled artisan could modify a lead compound in many ways, and that bioisosteric modification is just one "tool" or "basic general approach" among many. *See supra* ¶ 43. Although it is true that a bioisosteric modification can result in unintended or undesired changes in activity, that unpredictability is antithetical to any reasonable expectation of success. *See Procter & Gamble Co.* v. *Teva Pharm. USA, Inc.*, 566 F.3d 989, 996–97 (Fed. Cir. 2009); *see also In re Armodafinil Patent Litig. Inc. ('722 Patent Litig.)*, 939 F. Supp. 2d 456, 491 (D. Del. 2013).

84.     Roxane's assertion that a person of skill would be motivated to attempt a bioisosteric modification with a reasonable expectation of success is nothing more than hindsight. *In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1070–71 (Fed. Cir. 2012) ("[Where] a defendant urges an obviousness finding by 'merely throw[ing] metaphorical darts at a board' in hopes of arriving at a successful result, but 'the prior art gave either no indication of which parameters were critical <u>or no direction as to which of many possible choices is likely to be successful</u>,' courts should reject 'hindsight claims of obviousness.'" (quoting *In re Kubin*, 561 F.3d 1351, 1359 (Fed.Cir.2009) (emphasis added))).

### *(b)      The '610 Patent*

85.     The parties agree that there was a known problem at the time of the '610 patent invention:  iloperidone was associated with QTc prolongation.  Roxane argues that solving that problem was obvious because otherwise FDA would not have approved the drug.  That confuses the need to solve the problem with the obviousness (or non-obviousness) of the solution.  A solution is not obvious just because the problem itself was clear.

*(1)      It was not obvious to look at CYP2D6*

86.     Roxane has not offered clear and convincing evidence that a skilled artisan would even consider CYP2D6 genetic polymorphisms as a potential cause of iloperidone-induced QTc prolongation, a fundamental failing.  There are many enzymes and non-enzymatic processes known to be involved in the metabolism of iloperidone, including several known polymorphic enzymes.  *See supra* ¶ 18.  The myriad combinations and options to consider are inconsistent with obviousness.  *See Bayer*, 575 F.3d at 1347 ("*KSR* requires the number of options to be 'small or easily traversed.'" (quoting *Ortho-McNeil Pharm., Inc.* v. *Mylan Pharm., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008))).  When there is "'no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful,' courts should reject 'hindsight claims of obviousness.'"  *In re Cyclobenzaprine*, 676 F.3d 1071 ((quoting *In re Kubin*, 561 F.3d at 1359)); *In re '318 Patent Infringement Litig.*, 578 F. Supp. 2d 711, 729 (D. Del. 2008).  If Roxane seeks to argue that the solution was obvious to try, the sheer volume of options refutes that effort.  *See Leo Pharm. Prods., Ltd.* v. *Rea*, 726 F.3d 1346, 1356–57 (Fed. Cir. 2013) ("The problem was not known, the possible approaches to solving the problem were not known or finite, and the solution was not predictable.  Therefore, the claimed invention would not have been obvious to try to one of ordinary skill in the art.").

87.     Indeed, the prior art on which Roxane relies would have taught away from investigating CYP2D6.  *Supra* I.C.(2)(b).  Mutlib suggested that CYP2D6 does <u>not</u> play a significant role in iloperidone metabolism.  Several review articles, including Kirchheiner, Caccia, and Raggi, suggested that CYP2D6 is not relevant to iloperidone metabolism.  *Supra* ¶ 49.  Whatever P95 data Subramanian relied on was withheld from publication as proprietary.  *Supra* ¶ 48.  Such conclusory and inaccurate disclosures cannot constitute clear and convincing evidence of obviousness.  *See Novartis Pharm. Corp.* v. *Par Pharm., Inc.*, 48 F. Supp. 3d 733,

756 (D. Del. 2014).

> (2)  *A person of skill would not know that genotypic CYP2D6 PMs should have their dosage reduced, or by how much*

88.     Roxane also failed to adduce clear and convincing evidence that the prior art taught that a genotypic CYP2D6 PM should have her dose of iloperidone reduced, much less by how much.  The complete absence of any such teaching or suggestion defeats Roxane's obviousness argument.  *See, e.g.*, *Shire LLC* v. *Amneal Pharm., LLC*, 802 F.3d 1301, 1307–09 (Fed. Cir. 2015); *Broadcom Corp.* v. *Emulex Corp.*, 732 F.3d 1325, 1334 (Fed. Cir. 2013).

89.     Roxane's asserted prior art proves that it was not known that iloperidone dosage should be reduced for genotypic CYP2D6 poor metabolizers, nor was that expected or predicted. *Supra* I.C.(2)(c).  Instead, read together, the prior art teaches away from a dosage reduction for iloperidone; and, even if dosage adjustment is needed, the prior art discloses countless options for adjusting dosage for genotypic CYP2D6 PMs generally, ranging anywhere from ceasing drug administration, to increasing dosage, to decreasing dosage.  *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994); *Syntex (U.S.A.) LLC* v. *Apotex, Inc.*, 407 F.3d 1371, 1380 (Fed. Cir. 2005); *Leo Pharm.*, 726 F.3d at 1356–57.

> (3)  *The relationship between iloperidone and its metabolites and the hERG channel was not known.*

90.     Roxane also admits that the mechanisms for how iloperidone affects QTc prolongation was unknown—the prior art gave no indication that iloperidone and some of its metabolites could block the hERG channel, which is the cause of iloperidone-induced QTc prolongation.  *See supra* I.C.(2)(d).  Uncovering which metabolites are responsible for causing iloperidone-induced QTc prolongation is central to the '610 patent invention, *see supra* ¶ 56, and its absence from the prior art is fatal to Roxane's obviousness case.  *See Shire*, 802 F.3d at 1307–09; *K/S Himpp v. Hear-Wear Techs. LLC*, 751 F.3d 1362, 1366 (Fed. Cir. 2014).

>    *(4)   FDA Guidance does not supply the elements of the claims or*
>    *motivation to combine*

91.    Roxane argues that FDA Guidance would motivate a skilled artisan to undertake the experimental research that would result in the invention of the '610 patent. *See supra* I.C.(2)(e). Because, Roxane asserts, FDA would not approve iloperidone without some means of reducing QTc prolongation risk, Polymeropoulos's invention was obvious. That confuses the need to solve a problem with the obviousness of the solution. An invention is not obvious, or obvious to try, where the prior art only provides general research guidance. *In re Tomlinson*, 363 F.2d 928, 932 (C.C.P.A. 1966) (Rich, J.); *Abbott Labs.* v. *Sandoz, Inc.*, 544 F.3d 1341, 1352 (Fed. Cir. 2008) ("The Court in *KSR* did not create a presumption that all experimentation in fields where there is already a background of useful knowledge is 'obvious to try,' without considering the nature of the science or technology. The methodology of science and the advance of technology are founded on the investigator's educated application of what is known, to intelligent exploration of what is not known.").

92.    Roxane has not proven by clear and convincing evidence that the research and experimentation leading to the '610 patent was obvious or routine activity. *Supra* I.C.(2)(e). As Roxane's study-design expert (McCulloch) admitted, the important, nonobvious nuances to the design of clinical trials, and an inappropriate trial design, may lead a skilled artisan away from the invention. *In re Dow Chem. Co.*, 837 F.2d 469, 473 (Fed. Cir. 1988) ("The PTO presents, in essence, an 'obvious to experiment' standard for obviousness. However, selective hindsight is no more applicable to the design of experiments than it is to the combination of prior art teachings."). In fact, Novartis's 0104 study taught away from even trying to assess any CYPD26 genetic role in iloperidone-induced QTc prolongation; Novartis concluded, wrongly, that CYP2D6 poor metabolizers face no higher risk of cardiac side effects. *Supra* ¶ 58.

### (c)  Objective Indicia of Nonobviousness for the '610 Patent

93.  "Objective indicia of non-obviousness 'can be the most probative evidence of non-obviousness in the record.'"  *Institut Pasteur* v. *Focarino*, 738 F.3d 1337, 1346 (Fed. Cir. 2013); *see also In re Cyclobenzaprine*, 676 F.3d at 1075.  These include long-felt but unsolved need, failure of others, and unexpected results.  *See, e.g.*, *Graham*, 383 U.S. at 17–18; *Procter & Gamble*, 566 F.3d at 997-98.  It remains Roxane's burden to clearly and convincingly prove obvious in light of all the evidence, including indicia of non-obviousness.  *Microsoft*, 131 S. Ct. at 2245–46; *In re Cyclobenzaprine*, 676 F.3d at 1077–79.

94.  The '610 patent satisfied a long-felt, unsolved need to mitigate the risk of iloperidone-induced QTc prolongation.  *See supra* I.C.(2)(f).  *Geo. M. Martin Co.* v. *Alliance Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1304 (Fed. Cir. 2010) (citing *Ecolochem, Inc.* v. *S. Cal. Edison Co.*, 227 F.3d 1361, 1376–77 (Fed. Cir. 2000)).  In *Procter & Gamble*, the lack of a previous effective treatment for osteoporosis, coupled with the invention's meeting of that need, supported a finding of nonobviousness.  *See* 566 F.3d at 998.  So, too, here.  The invention of the '610 patent was essential to FDA approval of iloperidone.  *See supra* I.C.(2)(f).  Novartis's failure to solve the QTc problem, despite extraordinary resources, is further evidence of nonobviousness. *See id.*; *In re Cyclobenzaprine*, 676 F.3d at 1080–81; *Minn. Mining & Mfg. Co.* v. *Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1574 (Fed. Cir. 1992); *see also Graham*, 383 U.S. at 17–18.  So, too, is Novartis's sale of the then-unapproved iloperidone to Vanda for $500,000, only to pay $200,000,000 to license it back a few years later after Vanda secured FDA approval.  *See supra* I.C.(2)(f); *see also InTouch*, 751 F.3d at 1352.

### 3.  Subject-Matter Eligibility

95.  Roxane's challenge under 35 U.S.C. § 101 requires proof by clear and convincing evidence that the asserted claims are directed to patent-ineligible subject matter.  *See Bristol-*

*Meyers Squibb Co.* v. *Merck & Co.*, No. 15-560 (GMS), 2016 WL 1072841 (D. Del. Mar. 17, 2016).  Roxane must establish (1) that the claims are directed to a patent-ineligible concept—*i.e.*, a law of nature; and (2) that there is no "inventive concept"—"some element or combination of elements sufficient to ensure that the claim in practice amounts to 'significantly more' than a patent on an ineligible concept."  *DDR Holdings, LLC* v. *Hotels.com. L.P.*, 773 F.3d 1245, 1255 (Fed. Cir. 2014) (quoting *Alice Corp.* v. *CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014)).

96.     That Roxane has had to change its asserted law of nature repeatedly is evidence that there is no law of nature claimed here.  Roxane initially posited a law of nature that "where a patient poorly metabolizes a drug, the patient should receive less of that drug."  [D.I. 9 at 11].  That is simply untrue; for some drugs, no reduction is needed.  *See supra* ¶ 61.  At trial, Roxane next offered the law of nature that higher levels of iloperidone would result in increased side effects.   But that is also untrue.  *See supra* ¶ 62.  Finally, Roxane asserted that there are not one but two laws of nature at issue here, one that genetic variations determine whether a person will be a genotypic CYP2D6 poor metabolizer and the other that CYP2D6 can affect how iloperidone is metabolized.  *See supra* ¶ 63.  The '610 patent, however, does not claim either of these propositions.  *See Alice*, 134 S. Ct. at 2355 (observing that the subject matter eligibility analysis focuses on the claims); *see also Kaavo Inc.* v. *Cognizant Tech. Sols. Corp.*, No. CV 14-1192 (LPS) (CJB), 2016 WL 476730, at *5 n.7 (D. Del. Feb. 5, 2016) (rejecting broadly articulated abstract idea because "it would stray too far from the actual wording of the claim").   Rather, the claims are akin to what the Federal Circuit recently suggested <u>is</u> patent-eligible: "Singling out a particular subset of patients for treatment (for example, patients with a particular gene) may reflect a new and useful invention that is patent eligible despite the existence of prior art or a prior art patent disclosing the treatment method to patients generally."  *Prometheus Labs., Inc.* v.

*Roxane Labs., Inc.*, 805 F.3d 1092, 1098 (Fed. Cir. 2015) (Dyk, J.)).

97.     Roxane argues that it is common sense that too much of a drug can cause side effects, and that it is routine and conventional to give a lower dose to reduce side effects. The trial evidence disproved this. For some drugs metabolized by CYP2D6, there is no dose reduction needed for poor metabolizers. For some drugs, a dose reduction would lower some side effects but have no effect on, or even increase, others. This is true for iloperidone itself, where some side effects are not lessened in poor metabolizers by lowering the dose. *See supra* I.C.(2)(c); I.C.(2)(d). The '610 patent claims rely on the determination of whether there is a genetic component to iloperidone-induced QTc prolongation (it turns out, there is), whether that genetic link creates an avenue for a dosage-related adjustment (it turns out, it does), and what dosage will preserve efficacy while increasing safety (a half dose in CYP2D6 poor metabolizers). None of this was known, and none of it is a law of nature or a routine step. Unlike in *Mayo*, the claims here do far more than "simply describ[ing]" a relationship the Court deemed to be a natural law, 132 S. Ct. at 1297. Furthermore, one of the risks of patenting a natural law is preemption of further research. There is no such risk here. *See Alice*, 134 S. Ct. at 2354. The '610 patent does not prevent research into CYP2D6 genetics or metabolism, or even into the role of CYP2D6 in treating schizophrenia with other antipsychotics.

### 4.     Written Description

98.     Roxane argues that the '610 patent lacks written description because the data supporting a less-than-12mg dosage for poor metabolizers are not statistically significant. They do not need to be. The patent need only "reasonably convey[] to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date." *Ariad Pharm. Inc.* v. *Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) (en banc). There is not even a requirement of "'examples or an actual reduction to practice,'" much less of statistical significance. *Alcon*

*Research Ltd.* v. *Barr Labs., Inc.*, 745 F.3d 1180, 1190–91 (Fed. Cir. 2014) (quoting *Ariad*, 598 F.3d at 1350)). The written description of a 12mg dose for poor metabolizers is explicit: the patent identifies that exact dose. *Supra* ¶ 65. The patent even notes that the data are not statistically significant, but notes the existence of a trend warranting further study. No more is required to satisfy 35 U.S.C. § 112.

**D.      Relief**

99.      Because Plaintiffs have proven infringement and Roxane has not proven invalidity, the Court should order the effective date of Roxane's ANDA to be no sooner than the expiration of the '610 patent, November 2, 2027. *See* 35 U.S.C. §§ 271(e)(2); (e)(4)(A); *In re Omeprazole Patent Litig.*, 536 F.3d 1361, 1367 (Fed. Cir. 2008).

100.     As an independent ground of relief, the Court should enter an injunction prohibiting Roxane from making, using, selling, offering for sale, or importing into the United States its iloperidone product until the expiry of the '198 and '610 patents. *See* 35 U.S.C. §§ 271(e)(4)(B), 283. Vanda, as a small company with only two drugs on the market, will be irreparably harmed by Roxane's generic iloperidone. *Supra* I.D; *see also Celsis In Vitro, Inc.* v. *CellzDirect, Inc.*, 664 F.3d 922, 930–31 (Fed. Cir. 2012); *Purdue Pharma L.P.* v. *Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1368 (Fed.Cir.2001); *Janssen Prods., L.P.* v. *Lupin Ltd.*, 109 F. Supp. 3d 650, 696 (D.N.J. 2014). Irreparable harm can also result from the patentee's "diminished ability to invest in research and development." *Janssen*, 109 F. Supp. 3d at 696. The balance of hardships weighs in favor of Vanda. Roxane—having chosen to file an ANDA— has brought on itself the harm of an injunction in defeat. *See Novartis Consumer Health, Inc.* v. *Johnson & Johnson—Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir.2002); *see also Robert Bosch LLC* v. *Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011); *Janssen Prods.*, 109 F. Supp. 3d at 702.

101.    Monetary damages will not compensate Vanda, because it will suffer a loss of goodwill, because it will have lost the right to exclude others if Roxane enters the market, and because the price erosion from Roxane's entry will be permanent and not recoupable by royalties.  *Supra* I.D; *see also Research Found. of State Univ. of N.Y.* v. *Mylan Pharm. Inc.*, C.A. No. 09-184 (LPS), 2012 WL 1901267, at *3 (D. Del. May 25, 2012); *accord Robert Bosch*, 659 F.3d at 1155.  Upon a finding of infringement and validity, the public interest favors an injunction, as that is how Congress chose to balance innovation and the value of generic drugs. *See Research Found.*, 2012 WL 1901267, at *3;  *see also Sanofi-Synthelabo* v. *Apotex, Inc.*, 470 F.3d 1368, 1383–84 (Fed. Cir. 2006).

102.    A permanent injunction should be entered enjoining Roxane from commercially manufacturing, using, offering for sale, selling or importing its proposed generic iloperidone prior to the expiration of the '198 patent and the '610 patent, including any extensions and marketing exclusivities, pursuant to 35 U.S.C. §§ 271(e)(4)(B) and 283.

**III.    Conclusion**

103.    For all these reasons, claim 3 of the '198 patent and the Asserted Claims of the '610 patent are infringed, and Roxane has failed to prove them invalid.  A proposed order entering judgment for Plaintiffs is attached as Exhibit A.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Ethan H. Townsend*

_____

Jack B. Blumenfeld (#1014)
Karen Jacobs (#2881)
Ethan H. Townsend (#5813)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
(302) 658-9200
jblumenfeld@mnat.com
kjacobs@mnat.com
etownsend@mnat.com

*Attorneys for Plaintiffs*

OF COUNSEL:

Nicholas Groombridge
Eric Alan Stone
Kira A. Davis
Josephine Young
Daniel J. Klein
PAUL, WEISS, RIFKIND, WHARTON &
    GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019
(212) 373-3000

*Attorneys for Plaintiffs*

April 18, 2016

**Appendix A - Vanda's Witnesses**

**Dr. Mihael Polymeropoulos**



Dr. Polymeropoulos is an inventor on U.S. Patent No. 8,586,610 ("the '610 patent"). He is the founder and Chief Executive Officer of Vanda Pharmaceuticals Inc. Prior to founding Vanda, Dr. Polymeropoulos was Vice President and Head of the Pharmacogenetics Department at Novartis AG from 1998 to 2003. Prior to his tenure at Novartis, he served as Chief of the Gene Mapping Section, Laboratory of Genetic Disease Research, National Human Genome Research Institute, from 1992 to 1998.

Dr. Polymeropoulos testified about the invention of the '610 patent. Tr. at 70:5–165:7.

**Dr. Larry J. Kricka**



Dr. Kricka is an expert in pathology, laboratory medicine, and genetic testing. He currently, and has been since 1987, a Professor of Pathology and Laboratory Medicine at the University of Pennsylvania and will assume Emeritus status in 2017. From 1987 through 2015, he was the Director of the General Clinical Chemistry Laboratory at the University of Pennsylvania Medical Center.

Dr. Kricka testified about the infringement of the '610 patent. Tr. at 165:14–220:6.

**Dr. Sheldon H. Preskorn**



Dr. Preskorn is an expert in the field of psychopharmacology and psychiatry. He is a board-certified psychiatrist and a Professor in the Department of Psychiatry at the University of Kansas School of Medicine-Wichita (KUSM-W), a position he has held since 1981. Since 2011, he has served as the Chief Science Officer for KUSM-W's Clinical Trials Unit.

Dr. Preskorn testified about the infringement of the '610 patent. Tr. at 220:16–260:2; 263:15–293:17.

**Dr. Gustavo Alva**

| | |
|---|---|
|  | Dr. Alva is an expert in neuropsychiatry and the treatment of schizophrenia patients.  He is a Distinguished Fellow of the American Psychiatric Association and a Diplomate of both the American Board of Psychiatry and Neurology and the American Board of Geriatrics.  Dr. Alva is the Medical Director of ATP Clinical Research.  He is also part of the Volunteer Faculty in the Department of Psychiatry at the University of California, Riverside.  He has previously been an Associate Professor and Deputy Director of the Clinical Research Division in the Department of Psychiatry at the University of California, Irvine, School of Medicine.<br><br>Dr. Alva testified about the infringement of the '610 patent.  Tr. at 294:2–340:22. |

**Ms. Julie Economou**

| | |
|---|---|
|  | Ms. Economou is Roxane's vice president of product development strategy.<br><br>Ms. Economou testified through designated deposition testimony as a 30(b)(6) designee on behalf of Roxane about the issue of intent.  Tr. at 364:6–372:1. |

**Ms. Sarah Smith**

| | |
|---|---|
|  | Ms. Smith is Roxane's associate director of drug regulatory affairs.<br><br>Ms. Smith testified through designated deposition testimony as a 30(b)(6) designee on behalf of Roxane to establish the foundation of certain documents.  Tr. at 372:15–377:16. |

**Dr. Curt Wolfgang**

|  | Dr. Wolfgang is an inventor on the '610 patent. He is the former Vice President, Program Director at Vanda. Before joining Vanda, he worked at Novartis doing pharmacogenetic research. Dr. Wolfgang has a Ph.D. in biochemistry from Ohio State University and did his postdoctoral research at the National Cancer Institute of NIH.<br><br>Dr. Wolfgang testified through designated deposition testimony about the invention of the '610 patent. Tr. at 474:21–487:7. |

**Mr. Joseph Strupczewski**

|  | Mr. Strupczewski is an inventor on U.S. Reissue Patent No. 39,198 ("the '198 patent"). From 1971 until his retirement in 2006, he worked for the company that was previously called Hoechst Pharmaceuticals and is currently known as Sanofi. He began as a junior chemist, eventually received his own lab, and was promoted to senior research chemist. He holds a Masters of Arts in organic chemistry from Temple University. He became a patent agent in 2002.<br><br>Mr. Strupczewski testified about the invention of the '198 patent. Tr. at 762:11–815:16. |

**Dr. Paul Allan Bartlett**

|  | Dr. Bartlett is an expert in medicinal chemistry. Dr. Bartlett was a Professor and the Chair of the Department of Chemistry at the University of California, Berkeley from 1996 to 2000; he assumed Emeritus status in 2003. Dr. Bartlett's primary research focus is and has been the design, synthesis and evaluation of biologically active compounds, and he has helped to advance both mechanism-based and structure-based strategies for the design of drug candidates. Dr. Bartlett has authored or co-authored more than 180 articles and abstracts on his own research and interests in the fields of organic chemistry, bioorganic chemistry and drug design, and is named as an inventor on nine patents in these areas.<br><br>Dr. Bartlett testified about the validity of the '198 patent. Tr. at 816:3–875:22. |

**Dr. Bryan Roth**



Dr. Roth is an expert in biochemistry, neuroscience, psychiatry, and psychopharmacology. Dr. Roth was an intern in psychiatry at the National Naval Medical Center (Bethesda) from 1983-84, and was a resident in psychiatry at Stanford University Medical Center as well as a Dana Foundation Fellow in Neuroscience at the Nancy Pritzker Laboratory of Molecular and Developmental Neurobiology, Stanford University Medical Center from 1988-91. During his internship and from 1983-86, Dr. Roth also conducted research in preclinical psychiatry and neuropharmacology at the National Institute of Mental Health. During his residency, he treated hundreds of patients suffering from schizophrenia, depression, and other psychiatric disorders. Currently, Dr. Roth is Professor of Pharmacology and Chemical Biology and Medicinal Chemistry at the University of North Carolina-Chapel Hill Medical School and School of Pharmacy with a secondary appointment in Psychiatry. He serves or has served on the editorial boards of multiple journals. In addition, Dr. Roth has published more than 400 papers and two books relating to psychopharmacology; neuroscience; atypical antipsychotics and their mechanisms of action; the pharmacology, mechanisms, and function of neurotransmitters and receptors in the brain; and the development of new screening methods for CNS drug discovery and drug safety including hERG liability. He has also participated as a prescribing physician in many trials of investigational antipsychotic drugs. Dr. Roth has consulted with the FDA and many pharmaceutical and biotechnology companies in areas related to drug safety and drug actions. He has extensive experience with antipsychotic clinical trials and treating patients suffering from schizophrenia. He also evaluated many putative atypical antipsychotics that failed and did not reach the market.

Dr. Roth testified about the validity of the '198 and '610 patents. Tr. at 877:2–940:6.

**Dr. Frederick Peter Guengerich**



Dr. Guengerich is an expert in biochemistry, drug metabolism, and pharmacology.  He is Professor of Biochemistry at Vanderbilt University School of Medicine, a position he has held since 1983.  Dr. Guengerich also served as the Director of the Center in Molecular Toxicology from 1980 to 2011.  Dr. Guengerich has also consulted for pharmaceutical companies, including on issues related to clinical trials. Dr. Guengerich's research has focused extensively on human cytochrome P450 enzymes.  His laboratory first purified what are now known as CYP 1A2, 2A6, 2C8, 2C9, 2D6, and 3A4 enzymes from human liver cells.  His research in this area has earned him several awards.

Dr. Guengerich testified about the validity of the '610 patent.  Tr. at 943:8–1008:14.

**Appendix B - Asserted Claims and the Court's Claim Construction**

## A.  Asserted Claims of the '198 Patent

The sole asserted claim of the '198 patent, claim 3, states as follows:

3.  A compound which is 1-[4-[3-[4-(6-fluoro-1,2-benzisoxazol-3-yl)-1-piperidinyl]-propoxy]-3-methoxyphenyl]ethanone or a pharmaceutically acceptable acid addition salt thereof.

The nonproprietary name for 1-[4-[3-[4-(6-fluoro-1,2-benzisoxazol-3-yl)-1-piperidinyl]-

propoxy]-3-methoxyphenyl]ethanone is "iloperidone."

## B.  Asserted Claims of the '610 Patent

The asserted claims of the '610 patent, claims 1-9, 11-13, and 16, state as follows:

1.  A method for treating a patient with iloperidone, wherein the patient is suffering from schizophrenia, the method comprising the steps of:
determining whether the patient is a CYP2D6 poor metabolizer by:
obtaining or having obtained a biological sample from the patient; and
performing or having performed a genotyping assay on the biological sample to determine if the patient has a CYP2D6 poor metabolizer genotype; and
if the patient has a CYP2D6 poor metabolizer genotype, then internally administering iloperidone to the patient in an amount of 12 mg/day or less, and
if the patient does not have a CYP2D6 poor metabolizer genotype, then internally administering iloperidone to the patient in an amount that is greater than 12 mg/day, up to 24 mg/day,
wherein a risk of QTc prolongation for a patient having a CYP2D6 poor metabolizer genotype is lower following the internal administration of 12 mg/day or less than it would be if the iloperidone were administered in an amount of greater than 12 mg/day, up to 24 mg/day.

2.  The method of claim 1, wherein the performing or having performed the genotyping assay step comprises:
extracting or having extracted genomic DNA or mRNA from the biological sample, and
sequencing or having sequenced CYP2D6 DNA derived from the extracted genomic DNA or from the extracted mRNA,
wherein the sequencing or having sequenced step further comprises:
amplifying or having amplified a CYP2D6 region in the extracted genomic

DNA or mRNA to prepare a DNA sample enriched in DNA from the CYP2D6 gene region; and
sequencing or having sequenced the DNA sample by hybridizing the DNA sample to nucleic acid probes to determine if the patient has a CYP2D6 poor metabolizer genotype; and
wherein the CYP2D6 poor metabolizer genotype is one of the CYP2D6G1846A genotype or the CYP2D6C100T genotype.

3. The method of claim 2, wherein the CYP2D6 poor metabolizer genotype is one of the CYP2D6G1846A (AA) genotype or the CYP2D6G1846A (AG) genotype.

4. The method of claim 3, wherein the CYP2D6 poor metabolizer genotype is the CYP2D6G1846A (AA) genotype.

5. The method of claim 2, wherein the CYP2D6 poor metabolizer genotype is one of the CYP2D6C100T (TT) genotype or the CYP2D6C100T (CT) genotype.

6. The method of claim 5, wherein the CYP2D6 poor metabolizer genotype is the CYP2D6C100T (TT) genotype.

7. The method of claim 1, wherein the step of internally administering iloperidone to the patient in an amount of 12 mg/day or less comprises internally administering iloperidone to the patient in an amount of 6 mg or less b.i.d.

8. The method of claim 2, wherein, if the patient has a CYP2D6 poor metabolizer genotype, then internally administering iloperidone to the patient in an amount of 6 mg b.i.d.

9. A method of treating a patient who is suffering from a schizoaffective disorder, depression, Tourette's syndrome, a psychotic disorder or a delusional disorder, the method comprising:
determining if the patient is a CYP2D6 poor metabolizer by obtaining or having obtained a biological sample from the patient, and performing or having performed a genotyping assay on the biological sample to determine whether the patient has a CYP2D6 poor metabolizer genotype, and
if the patient is a CYP2D6 poor metabolizer, then internally administering iloperidone to the patient in an amount of up to 12 mg/day, and
if the patient is not a CYP2D6 poor metabolizer, then internally administering iloperidone to the patient in an amount of greater than 12 mg/day, up to 24 mg/day.

11. The method of claim 9, wherein the CYP2D6 poor metabolizer genotype is one of:

CYP2D6G1846A (AA), CYP2D6G1846A (AG), CYP2D6C100T (TT), or CYP2D6C100T (CT).

12. The method of claim 9, wherein the method comprises: if the patient is a CYP2D6 poor metabolizer, then internally administering the iloperidone to the patient in an amount of 6 mg b.i.d.

13. A method of treating a patient who is suffering from a schizoaffective disorder, depression, Tourette's syndrome, a psychotic disorder or a delusional disorder, the method comprising:
determining if the patient is at risk for iloperidone-induced QTc prolongation by obtaining or having obtained a biological sample from the patient, and performing or having performed a genotyping assay on the biological sample to determine whether the patient has a CYP2D6 poor metabolizer genotype, wherein the presence of a CYP2D6 poor metabolizer genotype indicates risk for iloperidone-induced QTc prolongation, and
if the patient is at risk for iloperidone-induced QTc prolongation, then internally administering iloperidone to the patient in an amount of up to 12 mg/day, and
if the patient is not at risk for iloperidone-induced QTc prolongation, then internally administering iloperidone to the patient in an amount of greater than 12 mg/day, up to 24 mg/day.

16. The method of claim 13, wherein the method comprises: if the patient is at risk for iloperidone-induced QTc prolongation, then internally administering the iloperidone to the patient in an amount of 6 mg b.i.d.

## C.  The Court's Construction of the Claim Terms of the '610 Patent

This Court has already construed the claim terms at issue.  *See* Order Construing the

Terms of the U.S. Patent No. 8,586,610, dated September 9, 2015. [D.I. 125].

- The term "CYP2D6 poor metabolizer genotype" as used in the '610 patent means "a

  genotype that results in decreased activity of the CYP2D6 protein." *Id*. at 1 & n.1.

- The term "internally administering the iloperidone to the patient" has its ordinary meaning

  and is limited to internal administration, which the parties agree includes oral administration,

  and does not include external methods, such as topical application. *Id*. at 2 & n.2.  The term

  "internally administering the iloperidone to the patient" is not limited to "physically

  administering iloperidone to a patient" and is not necessarily physically performed by the

prescriber him- or herself.  *Id.*

- The terms "obtaining or having obtained," "performing or having performed," "extracting or having extracted," "sequencing or having sequenced," and "amplifying or having amplified" have their ordinary meaning and do not require "personal" or "previous" activity.  *Id.* at 3 & n.3.

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| VANDA PHARMACEUTICALS INC.     ) | |
|                       ) | |

VANDA PHARMACEUTICALS INC.    )
                        )
        Plaintiff,         )    C.A. No. 14-0757-GMS
                        )    (Consolidated with
    v.                 )    C.A. No. 13-1973 GMS)
                        )
ROXANE LABORATORIES, INC.,    )
                        )
        Defendant.      )

**[PROPOSED] FINAL JUDGMENT ORDER FOR**
**U.S. PATENT NOS. RE 39,198 AND 8,586,610**

From February 29, 2016 to March 4, 2016, the Court conducted a bench trial in the above-referenced matter. For the reasons set forth in the Findings of Fact and Conclusions of Law being issued herewith, the Court hereby enters judgment in the above-referenced matter with respect to U.S. Patent Nos RE 39,198 ("the '198 Patent") and 8,586,610 ("the '610 Patent") as follows:

1.      The drug product that is the subject of Defendant Roxane Laboratories, Inc. ("Roxane") Abbreviated New Drug Application ("ANDA") No. 20-5480 (including any amendments or supplements thereto) ("Roxane's ANDA Product") infringes claim 3 of the '198 Patent.

2.      Roxane's ANDA Product infringes each of claims 1–9, 11–13, and 16 of the '610 Patent.

3.      Claim 3 of the '198 Patent is not invalid.

4.      Claims 1–9, 11–13, and 16 of the '610 Patent are not invalid.

5.      Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any Food and Drug Administration approval of Roxane's ANDA No. 20-5480 shall be a date not earlier than the latest of the expiration of the '198 patent (November 15, 2016) or any applicable exclusivities and extensions.

6.      Pursuant to 35 U.S.C. § 271(e)(4)(A), the effective date of any Food and Drug Administration approval of Roxane's ANDA No. 20-5480 shall be a date not earlier than the latest of the expiration of the '610 patent (November 2, 2027) or any applicable exclusivities and extensions.

7.      Pursuant to 35 U.S.C. § 271(e)(4)(B), Roxane, its officers, agents, attorneys, and employees, and those acting in privity or concert with any of them, are hereby enjoined from engaging in the commercial manufacture, use, offer to sell, or sale with the United States, or importation into the United States of Roxane's ANDA Product prior to the expiration of the '198 patent.

8.      Pursuant to 35 U.S.C. § 271(e)(4)(B), Roxane, its officers, agents, attorneys, and employees, and those acting in privity or concert with any of them, are hereby enjoined from engaging in the commercial manufacture, use, offer to sell, or sale with the United States, or importation into the United States of Roxane's ANDA Product prior to the expiration of the '610 patent.

9.      Judgment is hereby entered in favor of Plaintiffs Vanda Pharmaceuticals Inc. ("Vanda") and  Aventisub LLC ("Sanofi") and against Roxane on (a) Vanda's and Sanofi's claim of infringement of claim 3 of the '198 patent; and (b) Roxane's counterclaims seeking declaratory judgments of non-infringement and invalidity with respect to the '198 patent.

10.     Judgment is hereby entered in favor of Plaintiff Vanda and against Roxane on Vanda's claim of infringement of claims 1–9, 11–13, and 16 of the '610 Patent.

SO ORDERED this ___ day of _____, 2016.

_____
The Honorable Gregory M. Sleet

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2016, I caused the foregoing to be electronically filed with the Clerk of the Court using CM/ECF, which will send notification of such filing to all registered participants.

I further certify that I caused copies of the foregoing document to be served on April 18, 2016, upon the following in the manner indicated:

David E. Moore, Esquire                           *VIA ELECTRONIC MAIL*
Bindu A. Palapura, Esquire
Stephanie E. O'Byrne. Esquire
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE  19801
*Attorneys for Roxane Laboratories, Inc.*


Kenneth G. Schuler, Esquire                       *VIA ELECTRONIC MAIL*
Emily C. Melvin, Esquire
Timothy J. O'Brien, Esquire
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL  60611
*Attorneys for Roxane Laboratories, Inc.*


Michael R. Seringhaus, Esquire                    *VIA ELECTRONIC MAIL*
LATHAM & WATKINS LLP
140 Scott Drive
Menlo Park, CA  94025
*Attorneys for Roxane Laboratories, Inc.*


Daniel G. Brown, Esquire                          *VIA ELECTRONIC MAIL*
LATHAM & WATKINS LLP
885 Third Avenue
New York, NY  10022
*Attorneys for Roxane Laboratories, Inc.*

Damion Jurrens, Esquire
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA  94111
*Attorneys for Roxane Laboratories, Inc.*

*VIA ELECTRONIC MAIL*

*/s/ Ethan H. Townsend*

Ethan H. Townsend (#5813)